**ILLINOIS MIGRANT COUNCIL, etc., et al., Plaintiffs-Appellees,**

v.

**Alva L. PILLIOD, etc., et al., Defendants-Appellants.**

No. 75–2019.

United States Courts of Appeals, Seventh Circuit.

Heard April 29, 1976.

Decided Aug. 17, 1976.
Rehearing En Banc Granted
Nov. 23, 1976.

Samuel K. Skinner, U. S. Atty., John W. Cooley, Asst. U. S. Atty., Chicago, Ill., for defendants-appellants.

Frank W. Munger, Jr., Urban Law Institute, Washington, D. C., for amicus curiae.

David A. Goldberger, ACLU, Bruce L. Goldsmith, Illinois Migrant Legal Assistance Project, Chicago, Ill., Robert S. Catz, Antioch School of Law, Washington, D. C., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, and CUMMINGS and TONE, Circuit Judges.

CUMMINGS, Circuit Judge.

Six individuals[1] and the Illinois Migrant Council (IMC), a not-for-profit corporation, brought this class action for declaratory and injunctive relief against nine named (including John Doe and Richard Roe) and 35 unknown officials of the Immigration and Naturalization Service (INS). IMC provides supportive services and acts as an advocate for illiterate migrant agricultural workers of Mexican heritage, and the individual plaintiffs are American citizens or permanent residents of Mexican descent. The complaint describes the class as consisting of "all persons of Mexican descent and all Spanish surnamed persons in Illinois." The 35 unnamed defendants are described as INS agents subordinate to the district director for the Chicago district of INS.[2] With the exception of Pilliod, who is a supervisory official of the INS stationed in Washington, D.C.,[3] the defendants are assigned to the Chicago district thereof and all are allegedly responsible for the actions complained of.

The complaint alleged that the INS has conducted and will conduct a pattern and practice of harassment (including illegal searches, seizures, arrests, interrogations, detentions and mass raids) against the individual plaintiffs and their class in violation of the First, Fourth and Fifth Amendments. Pursuant to plaintiffs' motion for a preliminary injunction, the district court held four days of hearings, after which defendants filed a motion to dismiss, which was denied on December 3, 1974. Thereafter plaintiffs filed a motion for certification of the above-described class.

On July 29, 1975, the district court entered an extensive memorandum opinion, concluding that plaintiffs were entitled to a preliminary injunction and certifying their class as "all persons of Mexican ancestry or of Spanish surname * * * lawfully present in the Judicial District of Northern Illinois." *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 892, 905 (N.D.Ill.1975). We affirm. The opinion contains findings of fact detailing the defendants' challenged conduct and summarized herein.

The plaintiffs disclosed three street encounters between defendants and four individuals. On September 18, 1974, plaintiffs Sandoval and Montanez were driving in Sandoval's car to the IMC office in Rochelle, Illinois. As they parked outside the office and were leaving the car, an INS car pulled alongside and the agents got out of their car. When Montanez was asked where he was born, he replied, "Mexico." He was asked for his identification and produced a satisfactory permanent resident alien card after being threatened otherwise with jail in Chicago. When Sandoval, an American citizen of Mexican descent, was asked to produce identification and refused to do so, the agents said they would have to take him to Chicago and forced him into the back seat of their car. He again refused to produce identification but was ordered out of the car when he implied that he was a U.S. citizen.

During the first week of October 1974, plaintiff Lopez was walking to his office at 19 West Jackson Boulevard in Chicago when he was asked by two strangers if he lived in the area. He responded "No" but that he worked around there. Then he was

1. Two other individual plaintiffs, Ninfa and Rutilio Arteaga, were permitted to withdraw from the action. The Urban Law Institute, Inc. filed an *amicus* brief supporting the district court's decision.

2. All defendants were originally sued in both their official and individual capacities, but on plaintiffs' motion the individual allegations

were stricken without prejudice to reinstatement.

3. Until just before the complaint was filed, Pilliod was Chicago District Director of the INS, later becoming INS Commissioner for Enforcement and stationed in Washington, D.C.

asked where he was born. When he inquired why he was being interrogated, the agent said he was from the INS and flashed his identification. Lopez then said that he was born in New Mexico. He is an American-born citizen of Mexican descent. At the time, he was attired in boots made in New Mexico, levis, an Illinois shirt, and a Mexican jacket.

Jose Ortiz, a member of the plaintiff class, stated that when he was walking with a friend on September 18, 1974, in Rochelle, Illinois, two INS agents stopped them and asked for Ortiz' papers. He was allowed to leave upon complying.

The district judge also made findings of fact with respect to "area control operations" conducted by the INS in Rochelle and Mendota, Illinois, without search or arrest warrants.

At 4:30 a. m. on September 18, 1974, defendant Theodore Giorgetti, an INS employee, and 32 armed INS agents began simultaneous operations on pre-selected targets in Rochelle. First, they knocked on the unlocked doors and entered two La Hacienda buildings where 55 female employees of the Del Monte Food Company were sleeping. The agents proceeded from bedroom to bedroom, demanding that the women occupants produce their papers. Afterwards they left the buildings without making any arrests.

The agents also searched the Del Monte cottages where male immigrant employees resided. The INS agents used essentially the same method of operation in those cottages. When one of the residents, the above-mentioned Jose Ortiz, was unable to produce his green card evidencing legal residency, he was forced to accompany the INS agents on their search and only released when another Del Monte employee assured them that Ortiz's papers were in order.

At the same time, an INS agent repeatedly kicked on the door of a small farmhouse near Rochelle occupied by Alonzo Solis, an American citizen migrant worker. The agent tried to force his way into the house but desisted only when the Solis'

child cried and Solis ordered him out. Solis dressed and showed the agent his "certificate" outside the house, whereupon the agent left.

At 5:00 a. m., INS agents also conducted similar operations at Del Monte plants 109 and 110. They questioned everyone who appeared to be of Latin heritage. Two Del Monte supervisors offered no resistance because they believed they had to allow the agents to search the plants.

In Mendota, Illinois, at 8:00 a. m. on September 26, 1974, defendant Giorgetti and 30 agents first went to the Motor Wheel plant. Nineteen employees were interviewed by Giorgetti, ten were arrested and five of the ten were subsequently permitted to return to work. The agents then proceeded to several other industrial targets in Mendota and to hotels, boardinghouses and private dwellings, resulting in the apprehension of 108 illegal aliens, 104 of whom were still in detention at the time of the hearing below.

Based on the foregoing findings, the district court concluded that 8 U.S.C. § 1357(a)(1) does not permit searches of this kind. The statute provides:

"Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

"(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; * * *."

The court ruled that this statute should be construed in a manner consistent with the Fourth Amendment. Relying particularly on *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607, the court held that "a person should not be stopped [by an INS agent] unless the agent reasonably suspects that he or she is an alien illegally in the country." 398 F.Supp. at 898. Concluding that the plaintiffs had satisfied the usual requirements for the issuance of a preliminary injunction, the court preliminarily enjoined seven named defendants in their official capacities and

all persons acting in concert with them from:

"(a) entering houses, dormitories, cottages or other dwellings situated in the Northern District of Illinois which are occupied by plaintiffs or any person of Mexican ancestry or of a Spanish surname who is, will be or has been lawfully present in the Northern District of Illinois, unless they possess a valid warrant to search or arrest, have probable cause to enter without such warrant, or have received permission voluntarily given by one lawfully entitled to give permission to enter;

"(b) arresting, detaining, stopping, and interrogating or otherwise interfering with plaintiffs or any person of Mexican ancestry or of a Spanish surname who is, will be or has been lawfully present in the Northern District of Illinois, unless they possess a valid warrant to search or arrest such person, have probable cause to search or arrest such person without such a warrant, or have reasonable suspicion based on specific articulable facts that such person is an alien unlawfully in the United States."

This appeal followed.

*Justiciability*

■ Defendants first assert that the district court lacked jurisdiction under 28 U.S.C. § 1331 because the controversy is non-justiciable.[4] Questions of justiciability are resolved with reference to the Article III command that courts hear only "cases or controversies" and policy considerations seeking to avoid embroiling the federal courts in disputes outside their role in our system of government. *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947; *Poe v. Ullman,* 367 U.S. 497, 503–504, 81 S.Ct. 1752, 6 L.Ed.2d 989. The case or controversy requirement demands that the proper parties, in an adversary relationship with one another, place before a court a dispute which is not only capable of decision by reference to judicially ascertainable standards, but also whose resolution is not committed by the text of the Constitution to another branch of the government. *Gilligan v. Morgan,* 413 U.S. 1, 8–9, 93 S.Ct. 2440, 37 L.Ed.2d 407; *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663. Related to these constitutional standards are certain policies of judicial restraint which deter a court from entertaining suits where either resolution of the dispute or the grant of relief would require the court to make administrative or other non-judicial determinations. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 LW 4095, 4098–4099; *Powell v. McCormack,* 395 U.S. 486, 517, 89 S.Ct. 1944, 23 L.Ed.2d 491.

■ On the facts presented to the district court, there is clearly a case or controversy. The plaintiffs have standing and are otherwise proper parties because they have alleged "some threatened or actual injury resulting from the punatively illegal action." *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674. Plaintiffs complain of repeated actions by INS officials in stopping members of plaintiffs' class without legal cause and in conducting illegal searches and seizures of dwelling places and factories. Plaintiffs assert and the district court found that these injuries resulted from a practice and policy of the INS to question individuals about their alienage simply because they appeared to be of Mexican ancestry. 398 F.Supp. at 900–901. Because plaintiffs have shown a specific pattern of conduct, akin to an explicit policy, they have demonstrated a reasonable likelihood of future harm, justifying their request for injunctive relief. *Allee v. Medrano,* 416 U.S. 802, 809–811, 94 S.Ct. 2191, 40 L.Ed.2d 566; *Baker v. Carr,* 369 U.S. 186, 226, 82 S.Ct. 691, 7 L.Ed.2d 663; *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

Both plaintiffs and defendants have the requisite personal interest in the outcome of the litigation, the granting or denial of

---

4. Since this is a jurisdictional point, it is immaterial that the defendants did not raise justiciability until after filing their notice of appeal.

injunctive relief. *O'Shea v. Littleton, supra,* 414 U.S. at 494, 94 S.Ct. 669. Plaintiffs and members of their class will be subjected to continued injury by the very nature of the policy challenged, *viz.,* the questioning of individuals based on their racial characteristics. The defendants are the individual agents who will execute the questioning and their supervisors, all of whom have the requisite interest in the case.

It is also clear that the dispute is capable of being resolved by applying judicially ascertainable standards. Paraphrasing *Baker v. Carr, supra,* 369 U.S. at 226, 82 S.Ct. at 715, "the question here is the consistency of [the INS actions] with the [Fourth Amendment]." The courts of the United States regularly enforce the strictures of that provision of the Bill of Rights. *United States v. Brignoni-Ponce, supra*; *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

■■■ We do not understand the defendants to argue that their actions are not subject to judicial review because of Art. I, § 8, cls. 3 and 4 of the Constitution. Cf. *Gilligan v. Morgan, supra,* 413 U.S. at 11–12, 93 S.Ct. 2440. Nor would we accept such an argument. See *Laird v. Tatum,* 408 U.S. 1, 15–16, 92 S.Ct. 2318, 33 L.Ed.2d 154; *Powell v. McCormack,* 395 U.S. 486, 519–

521, 89 S.Ct. 1944, 23 L.Ed.2d 491.[5] Rather, we understand defendants to question "whether protection for the [Fourth Amendment] right asserted can be judicially molded." *Powell v. McCormack, supra,* 395 U.S. at 517, 89 S.Ct. at 1961, quoting *Baker v. Carr, supra,* 369 U.S. at 198, 82 S.Ct. 691. We disagree with defendants' claim that the court below was not empowered to grant the relief requested in this case. The rationale for limiting judicial interference in the operation of other branches of government is that a court will be required to make decisions on matters over which it has no particular competence and thereby impede the orderly conduct of governmental affairs. This fear is misplaced here. The requested relief, an order enjoining defendants from stopping and searching individuals simply because they are of Mexican appearance or have Spanish surnames, does not involve the court in the internal affairs of the INS. It does not require the agency to undertake any affirmative act, whether by way of instituting new training procedures or promulgating new rules. It simply orders compliance with the Constitution. In such a case, it is immaterial that the injunction runs against the executive branch of the government.

---

**5.** The dissent argues that the federal courts lack power to issue the injunction requested here because Congress has plenary authority to exclude aliens. It is true that Congress has such power. It is also true that the INS agents act pursuant to the authority granted by Congress. It is not true, however, as the dissent's syllogism would have us hold, that the actions of INS officials are beyond judicial review so that we are barred from granting relief. As with any provision of the Constitution which purportedly grants Congress plenary power, whether exercise of that authority is beyond judicial review depends upon the context in which the officer acts. Compare *Gilligan v. Morgan, supra,* with *Laird v. Tatum, supra,* 408 U.S. at 15–16, 92 S.Ct. 2318; also *United States v. United States District Court,* 407 U.S. 297, 318–321, 92 S.Ct. 2125, 32 L.Ed.2d 752; *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. 691. This case does not involve the exclusion of an alien from the United States. See *Kleindienst v. Mandel,* 408 U.S. 753, 765–767, 92 S.Ct. 2576, 33 L.Ed.2d 683. Rather, it involves the legality of INS questioning individuals already present in this country, regardless of whether

those individuals are transient aliens, permanent residents, or natural-born citizens. Congress' power to exclude aliens cannot be interpreted so broadly as to limit the Fourth Amendment rights of those present in the United States. Consequently, the subject matter of this lawsuit is properly before the district court.

The relief appropriate for violations of plaintiffs' rights is a question entirely separate from the fitness of the dispute for judicial resolution. Although an extraordinary remedy, injunctive relief against lawless action by the federal executive is warranted under appropriate circumstances. The dissent has no quarrel with this proposition (*infra,* p. 1074, n.7). Whether such relief should be granted in a specific case depends upon the balancing of traditional equitable considerations. Congress' plenary power to exclude aliens enters the balancing by cautioning the courts to grant only that relief which does not unduly interfere with the exercise of lawful authority; the injunction issued below does not suffer from this evil (*infra,* pp. 1069–1071).

*Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 170, 2 L.Ed. 60; see also *Breen v. Selective Service Board,* 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653; *Green v. Connally,* 330 F.Supp. 1150 (D.D.C.1971), affirmed *sub nom. Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550. The requested relief, therefore, does not render this case non-justiciable. *Hague v. CIO, supra.*

The cases relied on by the defendants, *Gilligan v. Morgan, supra,* and *Rizzo v. Goode, supra,* are distinguishable. As we noted in *Calvin v. Conlisk,* 520 F.2d 1, 5 (7th Cir. 1975), vacated and remanded on other grounds, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307, judicial relief was refused in *Gilligan* because of a conflict with Art. I, § 8, cl. 16 of the Constitution with respect to the internal training and supervision of the militia. In addition, there was no showing that the members of the plaintiff class were likely to suffer any future harm. *Rizzo v. Goode, supra,* is also not applicable. As in *Gilligan,* there was no showing that plaintiffs would suffer any injury which would warrant injunctive relief. Second, in *Goode,* there was no pattern or practice of illegal action. Only 19 citizens' constitutional rights may have been infringed there (423 U.S. at 363, 96 S.Ct. at 600), whereas here hundreds have already been improperly accosted by the INS. Thus the risk of a member of the plaintiff class being stopped in violation of the Fourth Amendment is statistically much greater than the risk dealt with in *Goode.* Judge Marshall's preliminary injunction imposes no detailed guidelines for INS agents, nor does it spell out any elaborate procedures that might impede that agency's work. In *Goode,* by its affirmative decree, the district court was attempting to impose mandatory, comprehensive relief that would supervise the whole procedure for handling citizens' complaints against police officers even though none of the defendants had deprived the plaintiff classes of any constitutional rights, 423 U.S. at 374, 96 S.Ct. at 606. Here the

preliminary injunction, couched in negative terms, does not inject the chancellor into the day-to-day internal affairs or discretionary authority of the INS but merely insures compliance with the Fourth Amendment by those who had participated in the illegal transgressions. Finally, injunctive relief was refused in *Goode* because under principles of federalism, United States courts should not ordinarily interfere with internal disciplinary affairs of a state agency. 423 U.S. at 378, 96 S.Ct. at 608; see also *O'Shea v. Littleton, supra,* 414 U.S. at 500, 94 S.Ct. 669.

*Preliminary Injunction Tests*

 By now it is axiomatic that a preliminary injunction will not issue unless the movant establishes: (1) reasonable probability of success at trial; (2) irreparable injury; (3) lack of serious adverse effects on others; and (4) sufficient public interest. Judge Marshall determined that all these requirements had been met. 398 F.Supp. at 903–904. We agree.

 As to the likelihood of success on the merits, the warrantless entry of living quarters by law enforcement personnel is of course prohibited by the Fourth Amendment in the absence of reasonableness or probable cause. No witness testified that the INS had procured consent to the warrantless search of the Rochelle and Mendota dwellings. In fact, the Del Monte corporate officials did not even learn of the Rochelle searches until they were under way. This is insufficient. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797; *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854. Furthermore, those officials could not validly consent to the search of the employees' rooms. *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828.[6] No probable cause is asserted. Indeed if defendant Giorgetti had

---

6. *Milyonico v. United States,* 53 F.2d 937 (7th Cir. 1931), certiorari denied, 286 U.S. 551, 52 S.Ct. 502, 76 L.Ed. 1287, is not to the contrary. There the owner consented to a search of the premises, and illegal distilling operations were discovered in a rear room. The roomer's bedroom was not even searched.

**1070**

sufficient information to establish probable cause two days before the Rochelle raid and ten days before the Mendota raid (see U.S. Br. 13), he had ample time to procure a search warrant. The Spanish surnames and appearance of Mexican ancestry were insufficient to justify the INS activities. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 885–886, 95 S.Ct. 2574.

Similarly, under *Brignoni-Ponce,* the district court was justified in concluding that the street stoppages and interrogations of Lopez, Sandoval, Montanez and Ortiz and successive interrogations of persons in factories violated the Fourth Amendment because these persons were singled out by the INS agents solely because they looked like Mexicans or had Spanish surnames.[7] Rightly, racial appearance has never been considered sufficient to justify a search or seizure involved in random stops. See *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. 2574. In this case the stops occurred in the absence of trustworthy tips or suspicious behavior. Nor was there any reasonable ground to believe that the persons were armed or dangerous.

■ The district court held, and we agree, that a street stop is justifiable here only when the INS agent has a "reasonable suspicion based on specific articulable facts that such person is an alien [unlawfully] in the [United States]." *United States v. Brignoni-Ponce, supra,* 422 U.S. at 884, 95 S.Ct. at 2582.[8] Defendants argue that this standard is contrary to law. However, this

standard is substantially embodied in a 1969 INS guideline, but unfortunately it is not being followed by INS officers in the field. 398 F.Supp. at 902, 903.

Although defendants claim that the standard conflicts with the breadth of 8 U.S.C. § 1357(a)(1), they conveniently overlook the origin of this standard. Thus in *Brignoni-Ponce,* the Supreme Court held that said statute is so circumscribed by the Fourth Amendment that vehicles may be stopped by INS agents only "if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."[9] 422 U.S. at 884, 95 S.Ct. at 2582.

■ We do not think that *United States v. Martinez-Fuerte,* —— U.S. ——, 96 S.Ct. 3074, 49 L.Ed.2d ——, requires a different result. That case held that government agents did not need reasonable suspicion to stop cars at permanent border checkpoints for the purpose of asking occupants about their residence. That ruling is explicitly limited by the Court to those intrusions at permanent checkpoints —— U.S. at ——, 96 S.Ct. at 3087 because of the limited nature of the intrusion and the regularity of the exercise of authority. —— U.S. at ——, 96 S.Ct. at 3082–3084. *Martinez-Fuerte* therefore does not apply either to searches of dwellings (—— U.S. at ——, 96 S.Ct. at 3084) or street stops of individuals (—— U.S. at ——, 96 S.Ct. at 3082).[10]

---

**7.** See also *United States v. Guana-Sanchez,* 484 F.2d 590, 592 (7th Cir. 1973), certiorari granted, 417 U.S. 967, 95 S.Ct. 1344, writ dismissed as improvidently granted, 420 U.S. 513, 95 S.Ct. 1344, 43 L.Ed.2d 361.

**8.** As noted in "Reasonable Suspicion of Illegal Alienage as a Precondition to 'Stops' of Suspected Aliens," 52 Chicago-Kent Law Review 485, 497 (1975):

"While *Brignoni-Ponce* reserved the question of whether the suspicion must be of illegal alienage since the facts did not require such decision, the language used in the text continued to phrase the standard in terms of illegal alienage."

The Note agrees with the standard of justification adopted in the preliminary injunction.

**9.** See also *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, and *Terry v. Ohio, supra.*

**10.** We do not, by this discussion, intend to limit the right of INS agents to engage individuals on the street in casual conversations. Because the district court's order enjoins defendants from "arresting, detaining, stopping and interrogating," we do not understand its decision to limit the ability of INS agents to conduct casual conversations. We disagree with the Government when it claims that INS agents may ask questions and under threat of detention compel answers about the individual's right to be in this country. The Government argues that an INS agent may detain an individual on the street on a reasonable suspicion that he is an

■ Plaintiffs also established that defendants' conduct caused irreparable harm because the wrongs inflicted were not readily measurable in terms of monetary damages and the recovery of damages alone would not insure the cessation of such invasions in the future. Furthermore, the defendants might be insulated from damage suits if they could show their good faith. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972); *Tritsis v. Backer*, 501 F.2d 1021 (7th Cir. 1974).

■ Compelling the INS agents to comply with the dictates of the Fourth Amendment does not impose an improper burden upon them. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596. We also do not believe that enforcement of the injunction will unduly burden the defendants. The degree of court supervision of defendants' activities is no greater than that upheld in *Allee v. Medrano, supra*, and *Hague v. CIO, supra*. As in those cases, the defendants will still be able to exercise the full breadth of their lawful authority. *Allee v. Medrano, supra*, 416 U.S. at 814, 94 S.Ct. 2191; *Hague v. CIO, supra*, 307 U.S. at 517, 59

S.Ct. 954. Further, the injunction requires the court to review only those actions in which defendants allegedly violate plaintiffs' rights. It thereby avoids the problem, addressed in *Rizzo v. Goode, supra*, and *O'Shea v. Littleton, supra*, of attempting to regulate the internal affairs of the agency.[11] Finally, the public interest is served by the preliminary injunction, for otherwise the dragnet practices violating the Fourth Amendment rights of plaintiffs could continue unabated.

*Class Certification*

■ The Government next asserts that there was an improper certification of a defective class. In *Jenkins v. Blue Cross Mutual Hospital Ins., Inc.*, 522 F.2d 1235 (7th Cir. 1975), superseded on other grounds, 538 F.2d 164 (7th Cir. 1976) (en banc), this Court held that the denial of class certification is appealable in conjunction with the appeal of the denial of injunctive relief under 28 U.S.C. § 1292(a). See also *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 245 (3d Cir. 1975), certiorari denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679; 3B Moore's Federal Practice, ¶ 23.97 (1974 Supp.); 9 *op. cit.* ¶ 110.13[9] (1974 Supp.) and cases cited in *Jenkins, supra*, 522 F.2d at 1237. The logic of the

alien. As the Government concedes, this detention limits the individual's right to walk away (Br. 92). In accord with the Court of Appeals for the District of Columbia, we hold that when the individual is detained against his will for questioning, the INS agents must have a reasonable suspicion that he is an illegal alien. *Au Yi Lau v. Immigration and Naturalization Service*, 144 U.S.App.D.C. 147, 445 F.2d 217, 223 (1971), certiorari denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108.

The dissent argues that there is no Fourth Amendment violation when an INS agent merely questions an individual about his right to be in this country, relying on *Au Yi Lau, supra*, and *Shu Fuk Cheung v. Immigration and Naturalization Service*, 476 F.2d 1180, 1181–1182 (8th Cir. 1973). We do not disagree with this statement of the law. However, as the dissent notes, this rule is applicable only where the individual cooperates with the questioning officer. The dissent does not state what happens if the individual refuses to answer the questions, and consequently does not address what we believe to be a key issue in this case. We

note, however, that it would render meaningless the individual's right to walk away, as recognized by the dissent and *Terry v. Ohio, supra*, 392 U.S. at 16, 88 S.Ct. 1868, if that refusal were to be then used as grounds to justify detaining the individual. Because *Shu Fuk Cheung, supra*, also fails to address this issue, it is not in conflict with our decision.

11. The dissent is concerned that the threat of contempt will hamper INS agents in conducting investigations. This argument assumes that the district court will be inflexible in its choice of remedies to enforce its order. Surely this will not be the case. Because of the nature of concepts such as "reasonable suspicion" used in the preliminary injunction, the district court would scarcely hold in contempt those agents who act in good faith and who reasonably believe their actions are justifiable. The contempt sanction should be reserved for those instances, such as the dormitory searches in this case, where there is a blatant disregard for Fourth Amendment rights.

**1072**

rule is that the scope of the injunctive relief granted or denied is in large part determined by the class action question. This rule applies as well to the granting of class relief on a request for a preliminary injunction. Therefore we hold that the order certifying a class is appealable.

■ The defendants contend that the class, consisting of all persons of Mexican ancestry or of Spanish surname in the Northern District of Illinois, is amorphous and ill-defined. However, the class consists of all individuals who by virtue of defendants' policy are likely to be subjected to the illegal conduct. The district court's determination, therefore, is not erroneous. *Allee v. Medrano, supra,* 416 U.S. at 816, n. 10, 94 S.Ct. 2191; *Peterson v. Talisman Sugar Corp.,* 478 F.2d 73, 83 (5th Cir. 1973).

*Scope of Preliminary Injunction*

■ Defendants complain that the injunction unduly restricts their ability to stop and question individuals of certain racial characteristics. However, the standard contained in the order, requiring at least a reasonable suspicion for street encounters, complies with the law (*supra* at pp. 1070–1071). Defendants also contend that the terms of the preliminary injunction are vague and ambiguous because it forbids INS agents to enter homes, dormitories, cottages or other dwellings unless they "have received permission voluntarily given by one lawfully entitled to give permission to enter * *." However, case law has spelled out who may consent to such searches,[12] and guidelines drawn therefrom may be furnished by the INS to its agents. If any serious interpre-

tative problems arise, the district court is capable of resolving them as they occur. If a permanent injunction should ultimately be awarded, the district judge will doubtless endeavor to resolve any serious ambiguities then being raised by defendants before entering the final order. If, unlike the *Goode* district judge, he instead decides to afford only declaratory relief, INS agents would of course be liable for actions inconsistent therewith in the absence of proof of their bona fides.[13] We merely hold that the preliminary injunction is a permissible stopgap until the case can be finally tried.

Judgment affirmed.[14]

TONE, Circuit Judge (dissenting).

I am unable to join in the majority decision. There is, to begin with, a problem of standing under *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 604–605, 46 L.Ed.2d 561 (1976). *Cf.* also *O'Shea v. Littleton,* 414 U.S. 488, 493–499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), relied upon in *Rizzo.* These cases indicate that when the asserted basis for injunctive relief is unlawful law enforcement activities which have been directed at relatively few persons, and the possibility of repetition of those acts against those persons or any other particular individual is conjectural, the standing element of the requirement of a case or controversy is not met. *Cf.* also *Calvin v. Conlisk (II),* 534 F.2d 1251, 1252 (7th Cir. 1976).[1] The injunction in this case was granted in favor of a very large "class consisting of all persons of Mexican ancestry or of a Spanish surname who are, will be or have been lawfully present in the Judicial District of Northern Illinois." 398

12. See, *e. g., Stoner v. California, supra; Chapman v. United States, supra; Pizzola v. Watkins,* 442 F.2d 284 (5th Cir. 1974).

13. *Wood v. Strickland, supra.*

14. The defendants' motion to suspend the preliminary injunction order during the pendency of the appeal is now denied.

1. In neither *Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), nor *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2192, 40 L.Ed.2d 566 (1974), did the Court discuss the plaintiffs' standing, but those cases are distin-

guishable in any event. In *Hague* the official action constituted a prior restraint on the exercise of First Amendment rights by members of the target group, and there was therefore a demonstrable future impact on each member of the group. In *Allee,* the plaintiffs, a union and union organizers, were the targets of repeated and systematic harassment and of a state antipicketing injunction. There was no doubt as to the chilling effect of the wrongful conduct on the plaintiffs' rights of free expression, assembly, and association.

F.Supp. at 892.[2] Whether the possibility that any individual class member will be injured by future official conduct of the kind complained of is greater here than it was in *Rizzo*[3] or *Calvin* cannot be determined from this record, but I doubt that any difference that exists is legally significant. As for the organization plaintiff, it "can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 516, 95 S.Ct. 2197, 2214, 45 L.Ed.2d 343 (1975); *Calvin v. Conlisk (II), supra*, 534 F.2d at 1252–1253.

In *O'Shea v. Littleton, supra*, after concluding that the threat of injury to the plaintiffs from the challenged official course of conduct was "too remote to satisfy the case-or-controversy requirement," the Court observed that its conclusion was strengthened by a reluctance to interfere with the state's administration of its criminal laws. 414 U.S. at 498–499, 94 S.Ct. at 677, citing *Boyle v. Landry*, 401 U.S. 77, 81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). These considerations, the Court said, "shade into those determining whether the complaint states a sound basis for equitable relief . . . ." 414 U.S. at 499, 94 S.Ct. at 677. There is a similar relationship here. "[T]he principles of equitable restraint" which the Court in *O'Shea* proceeded to rely on as an alternative ground for denying relief, 414 U.S. at 502, 94 S.Ct. 669, and which concerned not the court's power but the appropriateness of granting the equitable relief sought,[4] related to federalism and a reluctance to impinge on the administration of state laws. Plaintiffs argue, and the majority at one point seems to agree,[5] that these principles therefore have no application here, where the impingement is upon the administration by the federal government of its laws. Plaintiffs thus state, "[N]otions of federalism and avoidance of conflict between the federal courts and state government are irrelevant." Indeed they are, but other problems are presented when a federal court is asked to enjoin the activities of a co-equal branch of the federal government. We recognized this in *Calvin*

2. The number of persons in that class cannot be approximated. In the United States as a whole, there are, in addition to the millions of persons of Mexican ancestry or with Spanish surnames who are citizens, many more who are aliens legally present in the country. In addition, the INS estimated in its 1974 Annual Report, p. iii, there may be 10 or 12 million aliens illegally in the country. The same report states that 92% of the deportable aliens arrested in 1974 were from Mexico. *Id.* at 94. See *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 n. 5, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). See also *United States v. Martinez-Fuerte*, —— U.S. ——, ——, 96 S.Ct. 3074, 3078, 49 L.Ed.2d —— (1976).

Even if the prerequisites for injunctive relief were satisfied as to the named plaintiffs and other persons of Mexican ancestry, the inclusion in the class protected by the injunction of "all persons . . . of a Spanish surname" who are lawfully present in the district seems to me to go too far. There is no showing that persons having Spanish surnames who are not of Mexican ancestry have been subjected to unreasonable searches and seizures. Nor is there any indication of how INS agents are to determine the surnames of persons who have Spanish surnames but do not appear to be of Mexican, Latin American, or Spanish ancestry.

3. While, as the majority states, there are more persons involved here than in *Rizzo*, there are fewer incidents.

4. "[W]hether the complaint states a sound basis for equitable relief," and "the principles of equitable restraint" which bear on that issue do not relate to the existence of a case or controversy, *i. e.*, the power of the court to entertain the case. Rather they relate to whether it is appropriate for the court to exercise its power. 414 U.S. at 499, 94 S.Ct. 669. Footnote 5 of the majority opinion thus misconstrues my argument. I agree that, if we assume plaintiffs have the necessary standing, whether relief should be granted here "depends upon the balancing of traditional equitable considerations," and that the issue therefore is whether the relief requested would "unduly interfere with the exercise of lawful authority." See note 5, *supra*, at p. 1068. But, for the reasons stated in the text of this dissent, I disagree with the majority's conclusion that this injunction "does not suffer from [the] evil" of undue interference.

5. In distinguishing *Rizzo*, the majority states: "Finally, injunctive relief was refused because under principles of federalism, United States courts should not ordinarily interfere with internal disciplinary affairs of a state agency."

*v. Conlisk (I)*, 520 F.2d 1, 5–6 (7th Cir. 1975), *vacated and remanded*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), when we distinguished *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), on the ground that "[t]here is no provision of the Constitution analogous to Article I, Section 8, Clause 16 (relied upon in *Gilligan*), that would be applicable to this case, which involves an area within the control of a municipal agency, rather than a co-equal branch of the federal government." See also *Rizzo v. Goode, supra*, 423 U.S. at 378–379, 96 S.Ct. at 608.[6]

"[P]rinciples of equitable restraint" analogous to those found applicable in *O'Shea*, 414 U.S. at 502, 94 S.Ct. 669, should govern here.[7] Congress' plenary power to exclude aliens has been described as "a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). " '[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* at 766, 92 S.Ct. at 2583, quoting from *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). Congress has exercised this power and charged the Attorney General and INS with the responsibility of administration and enforcement. The discharge of those responsibilities, which, as the District Court recognized, involves "the protection of the Nation and its economy from the consequences of illegal immigration," 398

F.Supp. at 898, will be disrupted and impeded by the injunction under review. *Cf. Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The fact that an injunction is negative in terms does not, of course, prevent it from having such an effect, as the Supreme Court recognized in *O'Shea*, 414 U.S. at 500–502, 94 S.Ct. 669, where a negative injunction was sought, *id.* at 492–493, 94 S.Ct. 669. The District Court in the case at bar recognized that it was attempting, in the injunction, to define "the standards under which defendants may perform their official duties in the future. . . ." 398 F.Supp. at 898. Those standards, however, are not precisely defined, for this would have required a detailed code interpreting and predicting past and future decisions under the developing law of search and seizure.[8] Often even judges, in the leisure of hindsight, cannot agree on whether in a given case there was probable cause or authorized consent justifying warrantless action, yet agents must decide such questions on the scene of action, on pain of contempt. Nor does the injunction indicate the "specific articulable facts," *id.* at 899, 900, 94 S.Ct. 669, which the District Court would hold necessary to justify a street or plant interrogation. The court recognized the impracticability of making "a list of articulable facts." 398 F.Supp. at 899. The agents are left to make their own "on-the-spot assessments of the totality of the circumstances which they observe and about which they are reliably informed." *Id.* The correct-

---

**6.** The appropriateness of judicial restraint in cases such as the one at bar has not been considered directly by the Supreme Court because the cases permitting sweeping federal injunctions against law enforcement officers, the extension of which *Rizzo v. Goode, supra*, appears to have limited, have so far involved only state officers. See, *e. g., Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).

**7.** I do not of course suggest that executive officers of the federal government are immune from injunctive remedies. In an appropriate case an injunction prohibiting or requiring specific action by such an officer may be obtained

by an individual, as in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803), and *Breen v. Selective Service Local Board No. 16*, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970), cited by the majority, or on behalf of a class, as in *Green v. Connally*, 330 F.Supp. 1150 (D.D.C.1971), *affirmed sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), also cited by the majority.

**8.** *Cf. Terry v. Ohio*, 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1968):

"No judicial opinion can comprehend the protean variety of the street encounter, and we can only judge the facts of the case before us."

ness of their assessments will have to be determined, and the standards thus fleshed out, in contempt proceedings, which may be instituted by any of perhaps hundreds of thousands of class members. The first round of such contempt proceedings, arising from events occurring during the pendency of the appeal,[9] is already under way. It seems likely that the District Court will be heavily involved in the operations of INS for a long time. Meanwhile, there is a real danger that agents' fear of being held in contempt will make them hesitant to perform their duties.[10] The injunction will "unnecessarily involve the courts in police matters and dictate action in situations in which discretion and flexibility are most important." *Long v. District of Columbia*, 152 U.S.App.D.C. 187, 469 F.2d 927, 932 (1972), quoted by Burger, C. J., concurring and dissenting in *Allee v. Medrano, supra*, 416 U.S. at 859–860, 94 S.Ct. 2191. See also Comment, *The Federal Injunction as a Remedy for Unconstitutional Police Conduct*, 78 Yale L.J. 143, 149 (1968).[11]

I recognize that the remedy of damages, authorized against federal officers in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), is imperfect. The amount of damages may be difficult to measure. Also, good faith is a defense, although that defense is available only if there is doubt as to

the lawfulness of official conduct, and then only until the doubt has been resolved and officers are thus put on notice. But citizens generally do not have injunctive protection against illegal acts, and, as noted above, there has been an insufficient showing that any individual member of the plaintiff class in this case is so uniquely situated that such protection is necessary as to him. *Cf. Calvin v. Conlisk (II), supra*, 534 F.2d at 1252–1253. In addition, implicit in *O'Shea* and *Rizzo* is the recognition that the comparative shortcomings of a damage action were not enough to compel injunctive relief in the face of the important reason for equitable restraint there articulated. Similarly, they are not enough, in my opinion, to justify the imposition by a federal court upon a co-equal branch of the federal government of sweeping, contempt-sanctioned prior restraints upon the exercise of a power which the Supreme Court has said is "to be exercised exclusively by the political branches of government." See *Kleindienst v. Mandel, supra*, 408 U.S. at 765, 92 S.Ct. at 2583.

Moreover, the imperfections of the damage remedy do not establish a case for the judiciary's regulation of the operations of the Executive Branch by injunction. Once the illegality of a given kind of INS conduct is established by court decision in a damage action or, as in *United States v.*

---

**9.** Numerous depositions had been taken but the District Court had not yet held hearings at the time this appeal was submitted to us.

**10.** In its note 11, added in response to the above portion of this dissent, the majority attempts to allay the concerns expressed in the text by suggesting that the contempt sanction will be available only when there is "a blatant disregard for Fourth Amendment rights." This seems to amount to a modification of the injunction. To some undetermined extent, it is not to be enforced by contempt. How the list of specific articulable facts which the District Court declined to provide, 398 F.Supp. at 899, is ever to be developed in the absence of contempt proceedings, is not made clear. At any rate, I remain of the view that the authorities cited in the text are correct in perceiving danger in .an injunction of the kind before us.

**11.** This distinguishes the case from *Green v. Connally, supra*, D.C., 330 F.Supp. 1150, in which the district court enjoined United States

Treasury officials from according tax exempt status and deductibility of contributions to private schools in Mississippi that discriminated against black students.

If the majority's reference to the possibility that the district judge may ultimately decide to afford only declaratory relief is to be read as indicating a preference for that kind of relief instead of injunctive relief, the problems discussed in the text are still not solved. The requirements of justiciability are not reduced when only declaratory relief is to be given. *Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). The existence of a broad and vague declaratory judgment would have an effect similar to an injunction upon the conduct and morale of the agents. And in any event, the appropriateness of declaratory relief would not justify the preliminary injunction.

*Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574 (1975), a criminal case, it is reasonable to expect that the future conduct of government agents will be governed by that decision. To assume otherwise is to assume that the Attorney General of the United States will behave lawlessly or allow his subordinates to do so.

If I were to reach the merits, I would agree with the majority and the District Court that the warrantless invasions of sleeping quarters were violations of the occupants' Fourth Amendment rights. Entering factory premises without the employer's consent, if it occurred, is a violation of his right, and I should think his invitees share in that right. The District Court's holding with respect to street interrogations, which is the basis for the standard embodied in the injunctive provisions governing interrogations in both street and plant settings, appears to be approved in the text of the majority opinion without much discussion; but footnote 10, added in response to this dissent, seems to qualify this approval. The correctness of the District Court's holding depends upon the extrapolation from *United States v. Brignoni-Ponce, supra*, 422 U.S. at 873, 95 S.Ct. 2574. As the District Court noted, 398 F.Supp. at 897, the Supreme Court in that case, while

holding that INS officers on roving patrol away from the border or its functional equivalents may not stop vehicles without a reasonably based suspicion that they contain aliens who may be illegally in the country, specifically reserved the question whether INS agents may "stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country." 422 U.S. at 884, n. 9, 95 S.Ct. at 2582. Vehicle stops, which were all the Supreme Court had before it in that case, always involve an involuntary detention and are much more serious intrusions than street interrogations. The District of Columbia Circuit, in a series of cases the District Court declined to follow, 398 F.Supp. at 898-899, has distinguished, in situations not involving vehicle stops, between mere questioning and temporary detention, recognizing that in the former situation the statute, § 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1), requires only a reasonable belief on the officer's part that the person to be questioned is an alien, not that the person is illegally in the United States.[12] The Eighth Circuit appears to be in accord.[13] I am not persuaded that an immigration officer violates a person's Fourth Amendment rights by the mere interrogation the statute authorizes.

**12.** In *Au Yi Lau v. INS*, 144 U.S.App.D.C. 147, 445 F.2d 217, 222 (1971), *cert. denied*, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971), Judge McGowan (with Judges Fahy and Leventhal), referring to that court's earlier *Yam Sang Kwai v. INS*, 133 U.S.App.D.C. 369, 411 F.2d 683 (1969), *cert. denied*, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1970), said:

"[W]e viewed this provision (Section 287(a)(1)) as according, at the least, to immigration officers the right to seek to interrogate individuals reasonably believed to be of alien origin. The underlying rationale of that decision was that the minimal invasion of the privacy of the individual approached for questioning was justified by the special needs of immigration officials to make such interrogations. This allowance for mere questioning, which assumes the individual's cooperation, is analogous to decisions which have contemplated the same scope of authority for police officers, as well as for other administrative officials." (Footnotes omitted.)

*Cf.* also *Cheung Tin Wong v. INS*, 152 U.S.App.D.C. 66, 468 F.2d 1123, 1128 (1972).

I do not read the INS guidelines as inconsistent with the District of Columbia Circuit's view (compare majority opinion following note 7), nor, apparently, did the District Court. The guidelines referred to by the majority "do not apply when [the agent] merely talk[s] to a person so long as he knows he is free to go . . . They apply only in situations where [the agent] detain[s] an individual but [does] not have probable cause to arrest him." 398 F.Supp. at 902. And while agents are instructed that they "should have what a reasonable person would consider 'reason to believe' that the person he proposes to interrogate is an alien," *id.* at 903, nothing is said about reason to believe the person's presence in the United States is illegal.

**13.** That court, in *Shu Fuk Cheung v. INS*, 476 F.2d 1180, 1181-1182 (8th Cir. 1973), after quoting from *Au Yi Lau* the passage quoted in note 12, *supra*, held that even a temporary detention for questioning did not amount to a constitutional deprivation.

One's "freedom to walk away," see *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is not restrained by mere questions, and the intrusion upon his privacy is minimal.[14] I would follow the Court of Appeals for the District of Columbia and allow INS agents to do what the statute authorizes them to do.[15] I would not, however, find it necessary to decide the questions discussed in this paragraph in order to dispose of this appeal because of my view that plaintiffs are not entitled to injunctive relief.

---

14. See Justice White, concurring, in *Terry v. Ohio, supra,* 392 U.S. at 34, 88 S.Ct. at 1886: "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way."

15. Perhaps by its note 10, added as a response to the above and preceding portions of the text, the majority would also. The majority agrees that INS agents not only may "engage individuals on the street in casual conversations," but also may "merely question an individual about his right to be in this country." I take it this amounts to a modification of the provision of the injunction prohibiting "interrogating" persons in the absence of specified articulable facts justifying a suspicion of alienage and illegal presence in the country. I agree with the majority that if the individual refuses to cooperate and walks away, the refusal could not be the basis for detaining him. Whether it could be considered in combination with other articulable facts, as even ethnic appearances may be, *United States v. Brignoni-Ponce, supra,* 422 U.S. at 887, 95 S.Ct. 2574, in arriving at a reasonable suspicion is a question best left for an actual case involving such facts.