Charles LaDUKE, et al.,
Plaintiffs/Appellees,

v.

Alan C. NELSON, etc., et al.,
Defendants/Appellants.

Nos. 83–3608, 84–4148.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 1985.

Decided June 10, 1985.

Michael J. Fox, Skellenger, Ginsberg & Bender, Seattle, Wash., for plaintiffs/appellees.

Marshall Tamal Golding, U.S. Dept. of Justice, Washington, D.C., for defendants/appellants.

Before FARRIS, ALARCON and FERGUSON, Circuit Judges.

FERGUSON, Circuit Judge:

The Immigration and Naturalization Service ("INS") appeals from an injunction issued by the district court prohibiting the INS from conducting farm and ranch checks of migrant farm housing without a warrant, probable cause, or articulable suspicion. *See LaDuke v. Nelson,* 560 F.Supp. 158 (E.D.Wash.1982). The INS also appeals the award of fees under the Equal Access to Justice Act. We affirm.

## I.

The plaintiffs, residents of migrant farm dwellings in the INS region known as the Spokane Sector, covering the states of Washington, Idaho and Montana, brought suit in 1977 alleging that the defendant's practice of initiating and executing searches of migrant farm housing violated their Fourth Amendment rights. The district court certified the plaintiffs as a class in 1979 under Federal Rule of Civil Procedure 23(b)(2). In 1981 the district court refined the plaintiff class to include all persons who have resided or will reside in particularly described farm housing within the Sector.

The district court found that the INS engaged in a "standard pattern" of searches within farm labor housing communities in the Sector. The court found that the INS initiated these warrantless searches without articulable suspicion or probable cause. *LaDuke,* 560 F.Supp. at 161; *see* note 12 *infra.* The armed Border Patrol agents periodically cordoned off migrant housing during early morning or late evening hours, surrounded the residences in emergency vehicles with flashing lights, approached the homes with flashlights, and stationed officers at all doors and windows. The agents would then conduct house-to-house searches either without consent or with the alleged "knowing" consent of the occupants.

The district court found that under these circumstances the occupants were not free to leave and, consequently, a seizure had taken place. The court further found that any consent obtained was involuntary given the substantial show of official force. The court also found that the seizures took place without probable cause, reasonable belief, or articulable suspicion that illegal aliens were present. The court enjoined the defendants and those acting in concert with them from engaging in similar unconstitutional farm check practices.

## II.

The standard of review over the district court's grant of a permanent injunction must, of course, be segmented according to the component functions performed by the district court. *See United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* — U.S. —, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Accordingly, the district court's findings of fact are reviewed under the clearly erroneous standard. Fed.R.Civ.P. 52(a). A district court's findings on the voluntariness of consent to search are reviewed under the clearly erroneous standard. *United States v. Caicedo-Guarnizo,* 723 F.2d 1420, 1423 (9th Cir.1984). The district court's

finding that the ranch checks are not based on articulable suspicion is also reviewed under the clearly erroneous standard. *United States v. Garcia-Nunez,* 709 F.2d 559, 561 (9th Cir.1983). *Cf. United States v. Cortez,* 449 U.S. 411, 416, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981).[1] Because the court's jurisdiction is dependent on Article III standing, this issue is subject to de novo review. Finally, the district court's determinations on questions of law and on mixed questions of facts and law implicating constitutional rights are reviewed de novo. *United States v. McConney,* 728 F.2d at 1203.[2]

## III.

■ This opinion will focus on the major arguments[3] raised by the INS in the following sequence:

(A) Do the plaintiffs have Article III standing to seek an injunction?

1. We note that *United States v. Maybusher,* 735 F.2d 366, 371 n. 1 (9th Cir.1984), holds that we exercise de novo review over district court determinations on the mixed question of fact and law regarding the presence of articulable facts justifying a detentive stop. Rather than reconcile the conflicting signals we have received from our past precedent, we have carefully reviewed the evidence and found the district court's finding of no articulable suspicion correct under both de novo and the clearly erroneous standards.

2. Similarly, we recognize that some post-*McConney* case law suggests that a Fourth Amendment "seizure" conclusion is reviewable under the clearly erroneous standard. *See United States v. Moreno,* 742 F.2d 532, 537 (9th Cir.1984) (Wallace, J., concurring). Reviewed under either standard, we reach the same conclusion as the district court.

3. The INS offers a general contention that because some class representatives, Charles La-Duke, for example, are not currently engaged in farm labor or residing in farm dwellings, they are not proper class representatives and therefore they lack standing to bring this suit. Although immaterial, plaintiffs assert that the class representatives will continue to reside in migrant worker housing. The INS argument as to the mootness of class representative claims was correctly rejected by the district court. The class was originally certified by Judge McNichols on October 13, 1981. When the district court redefined the class, largely to narrow the definition of the affected dwellings, it found the

(B) Did the district court err in its decision on the merits of plaintiffs' Fourth Amendment claim?

(C) Did the district court err in finding the essential prerequisites for an injunction met and, if not, is the issued injunction overbroad?

(D) Was the class properly certified under Fed.R.Civ.P. 23(b)(2)?

(E) Was the award of attorney fees and costs appropriate under the Equal Access to Justice Act?

## A.

■ The INS has challenged the plaintiffs' standing to bring suit for injunctive relief under Article III of the Constitution. The "case or controversy" standing requirement serves to limit federal jurisdiction to those cases in which an adversarial

class representatives still remaining in the case were representative as of the original certification date.

The district court based its 1981 finding that the class representatives would still represent the class on two alternate grounds. First, the court found the representatives' individual circumstances within the class action rule for constitutional violations "capable of repetition, yet evading review" pronounced in *Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). In the alternative, the district court followed Ninth Circuit precedent which permits class representatives to prosecute class claims even though their individual claims become moot after certification. *Kuahulu v. Employers Insurance of Wausau,* 557 F.2d 1334 (9th Cir.1977).

The basis for allowing class representatives to continue despite mooted individual claims lies in the notion that, upon certification, the class acquires an independent legal status, *Kuahulu,* 557 F.2d at 1336, for which the representative acts in a role "analogous to the private attorney general." *United States Parole Commission v. Geraghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980). Given the transience of the migrant labor force, *see also Gerstein v. Pugh,* 420 U.S. 103, 111 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975) ("constant existence of a class of persons suffering the deprivation is certain"), and the district court's finding that the representatives would continue to press the class claims with diligence, both of the district court's alternative grounds for rejecting the INS's mootness challenge to the class representatives' status are correct.

setting is guaranteed by the parties' "personal stake" in the outcome of the litigation. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The Supreme Court has also extended the standing inquiry beyond this Article III based minimum to include judicially imposed "prudential limitations" on the appropriate exercise of federal judicial power. *Allen v. Wright,* — U.S. —, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2205. The "irreducible minimum" demanded of a proper plaintiff by Article III's constitutional demands, however, requires that a plaintiff show he has "personally ... suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," that can be "fairly" traced to the defendant's challenged conduct, and which "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Added to this core constitutional standing test are judicially created prudential limitations, including: a general prohibition on "raising another person's legal rights",[4] a preference for the resolution of "generalized grievances" in the representative branches,[5] and the "requirement that a plaintiff's complaint fall within the zone of interests protected" by the pertinent law. *Allen v. Wright,* — U.S. —, 104 S.Ct.

3315, 3324–25, 82 L.Ed.2d 556 (1984). Finally, the Supreme Court has indicated that, at least when injunctive relief is sought, litigants must adduce a "credible threat" of recurrent injury.[6] *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983); *Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). We first address the significance of *Lyons* to plaintiffs' standing to seek injunctive relief.[7]

In *Lyons,* the plaintiff brought suit under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief against the City of Los Angeles and four of its police officers. The plaintiff had previously been subjected to an allegedly unprovoked and unjustified "chokehold" by a police officer in the course of a routine stop for a traffic violation. The Supreme Court reversed the Ninth Circuit's affirmance of a preliminary injunction in three discrete holdings. First, the Court held that Lyons lacked standing under the case or controversy clause of Article III to seek injunctive relief and consequently the lower courts lacked jurisdiction over his injunctive claim. *Id.* at 101, 103 S.Ct. at 1664. Second, the Court held that the plaintiff had not met the standards for issuance of injunctive relief. *Id.* at 109, 103 S.Ct. at 1668. Third, the Court held that the jurisprudential concerns of "equity, comity, and federalism" sharply constrict federal judicial oversight of "state law enforcement authorities," *id.*

---

4. This prudential standing limit has not been directly raised by the INS. Plaintiff class members are not attempting to assert the rights of nonparties to this litigation. Rather, they press and seek vindication of their personal rights. Moreover, in the context of this class action we find the "underlying justifications" for this prudential limitation absent. *See Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (Blackmun, J.).

5. *See generally* Note, *The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate,* 70 Geo.L.J. 1157 (1982) (discussing contours of the generalized grievance standing rule as a prudential limit).

6. We reserve ruling on whether remedial standing under *Lyons* is a prudential or constitutional standing limitation because the characterization

would have no effect on the disposition of this case.

7. We would prefer, however, to follow the Supreme Court's post-*Lyons* standing analysis in *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), and simply determine whether there is a "credible threat" that the plaintiffs will again be subject to ranch checks. *Id.* 103 S.Ct. at 1857 n. 3. *Kolender* involved a facial challenge to a California identification statute under which plaintiff had repeatedly been arrested. *Kolender* also sought injunctive relief. Nonetheless, we think *Lyons* "cannot be so easily confined to [its] facts," 461 U.S. at 108–09, 103 S.Ct. at 1668, and therefore will give careful attention to its teachings.

at 112, 103 S.Ct. at 1670, thereby making injunctive relief inappropriate.

As the Supreme Court summarized: "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." 461 U.S. at 105, 103 S.Ct. at 1667. Relying heavily on *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) and *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court held that Lyons did not face "a real and immediate threat of again being illegally choked." *Id.* 461 U.S. at 110, 103 S.Ct. at 1669. Finding the plaintiff's allegation of future injury speculative, *id.* at 108, 103 S.Ct. at 1668, Court held that the objective "reality of the threat of repeated injury," *id.* at 107 n. 8, 103 S.Ct. at 1668 n. 8, was beyond reasonable belief given the remote probability that Lyons would once again violate the law and incite an unjustifiable response by Los Angeles police. Finally, the Court found probative the fact that the district court had made "no finding that Lyons faced a real and immediate threat of again being illegally choked." *Id.* at 110, 103 S.Ct. at 1669.

■ At a minimum, *Lyons* requires that the "personal stake" showing necessary under Article III in cases involving injunctive relief includes an essential showing of the likelihood of similar injury in the future. At least for Lyons, past injury was insufficient, standing alone, to afford him a "personal stake" in the prospective relief provided by an injunction.[8] Four fundamental differences between *Lyons* and this case demonstrate why the plaintiff class has a sufficient "personal stake" under Article III to warrant the prospective relief only an injunction can provide.

■ The first difference between *Lyons* and this case lies in the respective district court findings on the likelihood of recurrent injury. The district court in *Lyons* made no finding of likely recurrence,

*Lyons*, 461 U.S. at 110 n. 9, 103 S.Ct. at 1669 n. 9, while the district court in this case made a specific finding of likely recurrence. *LaDuke*, 560 F.Supp. at 164. Second, the district court in this case explicitly found that the defendants engaged in a standard pattern of officially sanctioned officer behavior, 560 F.Supp. at 160, violative of the plaintiffs' constitutional rights. Conversely, the *Lyons* opinion expressly noted the absence of any written or oral pronouncements by the Los Angeles Police Department sanctioning the unjustifiable application of the chokehold and pointed to the absence of "any [record] evidence showing a pattern of police behavior" suggestive of an unconstitutional application of the chokehold. *Id.* 461 U.S. at 110 n. 9, 103 S.Ct. at 1669 n. 9. The Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat a "pattern" of illicit law enforcement behavior. *See Allee v. Medrano*, 416 U.S. 802, 812, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *see also INS v. Delgado*, — U.S. —, 104 S.Ct. 1758, 1763 n. 4, 80 L.Ed.2d 247 (1984); *Rizzo v. Goode*, 423 U.S. 362, 375, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976) (distinguishing *Allee* and *Hague* as involving patterns of misbehavior, not isolated incidents).

A third distinguishing feature that separates the present case from *Lyons* is the absence of the prudential limitations circumscribing federal court intervention in state law enforcement matters. *Lyons*, *Rizzo*, and *O'Shea* all involved attempts by plaintiffs to entangle federal courts in the operations of state law enforcement and criminal justice institutions. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (city law enforcement practices); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (same); *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (county criminal justice system).

---

**8.** Obviously, proof of past injury, especially of a repetitive character, is not immaterial to the issue of likely recurrence. *See Kolender v. Law-*

*son,* 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983); *Lewis v. Tully,* 99 F.R.D. 632, 641 (N.D.Ill.1983).

Obviously, none of the considerations inherent in the judicial concept of "Our Federalism," *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971), are implicated in constitutional challenges to executive branch behavior in federal courts. This court cannot rely on a state judiciary to correct the unconstitutional practices of federal officials. *Cf. Los Angeles v. Lyons*, 461 U.S. at 113, 103 S.Ct. at 1671 (comity counsels in favor of permitting state judiciary systems to oversee state law enforcement practices). Accordingly, the comity considerations which influenced the Supreme Court's decisions in *O'Shea, Rizzo* and *Lyons* are inapplicable in this case.

Enforcement of the nation's immigration laws has been delegated by Congress to the Executive Branch. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 864, 102 S.Ct. 3440, 3444, 73 L.Ed.2d 1193 (1982). Nonetheless, the federal judiciary has been vested with the ultimate authority to determine the constitutionality of the actions of the other branches of the federal government.[9] While the co-equal branches of the federal government are entitled to "the widest latitude in the dispatch of [their] own internal affairs," *Rizzo*, 423 U.S. at 379, 96 S.Ct. at 608 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)), the executive branch has no discretion with which to violate constitutional rights. *Accord Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1068 (7th Cir.1976), *modified en banc*, 548 F.2d 715 (1977).

■ The fourth and final feature which distinguishes this case from *Lyons* and *O'Shea*[10] is the fact that the plaintiffs constitute a certified class under Federal Rule of Civil Procedure 23(b)(2). For standing purposes, this court's inquiry must focus on the standing of the *class* to seek equitable relief. *See Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975) ("When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant."). Standing, however, is a jurisdictional element that must be satisfied prior to class certification. While the fact of certification will preserve a class's standing even after the named individual representatives have lost the required "personal stake," *see id.* at 399, 95 S.Ct. at 557, certification is not sufficient in itself to bestow standing on individuals or a class who lacked the requisite personal stake at the outset. The Supreme Court has held that, under the analogous doctrine of mootness, the "personal-stake requirement relat[ing] to the first purpose of the case-or-controversy doctrine" is met in class actions simply by class certification notwithstanding the subsequent loss of a "personal stake" by the class representative. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 400, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479 (1980). The *Geraghty* court, noting it was following precedent which had eroded the "strict, formalistic perception of Article III," *id.* at 404 n. 11, 100 S.Ct. at 1213 n. 11, applied a "flexible" approach in concluding the personal stake necessary to satisfy Article III's case or controversy requirement is satisfied by the class representative's cognizable interest in the certification decision. *Id.* at 404, 100 S.Ct. at 1212. This "personal stake" in the certification decision survives the mootness of the named plaintiffs' claims. *Id.* at 403, 100 S.Ct. at 1212.

9. As the Court made clear in *Almeida-Sanchez*, the statutory authority bestowed on the INS must comply with the Constitution and courts should narrowly construe the INS's statutory search and seizure authority consistent with Fourth Amendment precedent. *Almeida-Sanchez*, 413 U.S. 266 at 272, 93 S.Ct. 2535 at 2539, 37 L.Ed.2d 596 (1973).

10. *See O'Shea v. Littleton*, 414 U.S. at 494 n. 3, 94 S.Ct. at 675 n. 3. Although *Rizzo* did involve a class action, the Court declined to address the relevance of this fact. *Rizzo*, 432 U.S. at 373, 96 S.Ct. at 605. The *Rizzo* opinion found no "pattern" of police misconduct sufficient to justify the detailed affirmative injunction ordered by the lower courts to rectify the undifferentiated allegations of police abuse. *Id.* at 374, 96 S.Ct. at 605.

Although mootness and standing are separate justiciability requirements, they share the component of a necessary "personal interest" in the outcome of the litigation. *See Geraghty*, 445 U.S. at 397, 100 S.Ct. at 1209. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Geraghty*, 445 U.S. at 397, 100 S.Ct. at 1209 (quoting Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). Of course, as class representatives, by definition, the named plaintiffs can prosecute only the class claims. Accordingly, the standing inquiry on the merits of plaintiffs' case is directed to whether the class has standing—the necessary personal interest—to raise their constitutional claim for injunctive relief. The evidence presented at trial reveals that the plaintiff class faces a credible threat of recurring injury.

Each of the four distinguishing features described above supports the conclusion that the class has standing under Article III as interpreted by *Lyons*. The systematic pattern finding of the district court, the official INS policy for the conduct of ranch checks, and the district court's finding of likely recurrence all reinforce the reality and immediacy of the plaintiffs' constitutional claims. Unlike Lyons, the members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur. *See Lewis v. Tully*, 99 F.R.D. 632 (N.D.Ill.1983). The class members are subject to constitutional injury based on the completely innocent behavior of residing in migrant farm housing. Their grievances are general only to the residents of farm housing in the Spokane Sector. Members of the class have repeatedly suffered personal injuries in the past that can fairly be traced to the INS's standard ranch and farm practices. Class members have been and will continue to be aggrieved by the defendants' unconstitutional pattern of conduct in contravention of the Fourth Amendment. The equitable relief sought by the plaintiff class is both efficacious and responsive to the individual interests of class members and the certified class.

**B.**

The district court found that the defendants' pattern of conduct violated the plaintiffs' Fourth Amendment rights under either of two separate holdings. The district court first held that the methods employed by the Border Patrol—"seal[ing] off roads or paths leading out of the housing area" if possible, and "station[ing] officers at all doors and windows" of the dwellings to prevent egress—constituted a "seizure" of the occupants such that "a reasonable person would have believed that he was not free to leave." *LaDuke*, 560 F.Supp. at 162–63. Because the seizure thus preceded the alleged consent, the question of consent is immaterial to the finding of a Fourth Amendment violation. In the alternative, the district court concluded that under the INS's standard farm check practice the consent given by the farm occupants was not voluntary.

In response, the INS argues that the consent given by the occupants was voluntary and, citing *INS v. Delgado*, —— U.S. ——, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), contests the district court's conclusion that a "seizure" occurs in the course of their farm and ranch checks. Other than its contention, raised unsuccessfully in the district court, that farm housing searches are identical to factory worksite sweeps, the INS has not explained why it requires its agents to obtain a warrant for urban residential searches but not for rural residential searches.[11]

---

**11.** These ranch checks are not border area searches and the INS has not contended that these area control operations are conducted under its border control authority. Moreover, the Fourth Amendment does not permit the INS to differentiate on a per se basis in the privacy accorded different stocks of housing. Without question, the Fourth Amendment was intended to protect the resident's, not the INS's, expectation of privacy.

The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be

In fashioning the injunction, the district court followed the law of this and every other circuit which has addressed the issue by requiring the INS to adduce articulable suspicion of both alienage and unlawful presence prior to the initiation of detentive stops. *See, e.g., Benitez-Mendez v. INS,* 707 F.2d 1107, 1100 (9th Cir.1983), *amended* 748 F.2d 539 (9th Cir.1984) (clarifying that a seizure had taken place); *International Ladies Garment Workers Union v. Sureck,* 681 F.2d 624, 638 (9th Cir.1982), *rev'd on other grounds sub nom. INS v. Delgado,* —— U.S. ——, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). *Accord Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1070 (7th Cir.1976), *modified on reh'g en banc,* 548 F.2d 715 (1977); *Ojeda-Vinales v. INS,* 523 F.2d 286, 287 (2d Cir.1975) (following *Au Yi Lau* ); *Au Yi Lau v. INS,* 445 F.2d 217, 223 (D.C.Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971); *Ramirez v. Webb,* 599 F.Supp. 1278, 1282 (W.D.Mich.1984). Consistent with the statutory language of 8 U.S.C. § 1357(a)(1), however, the district court's injunction does permit nondetentive interrogations based solely on alienage. *LaDuke,* 560 F.Supp. at 165. *Accord Illinois Migrant Council v. Pilliod,* 548 F.2d 715 (7th Cir.1977) (en banc). *But see Marquez v. Kiley,* 436 F.Supp. 100 (S.D.N.Y.1977) (Fourth Amendment bars both detentive and nondetentive INS interrogations based solely on alienage).

1.

■ The district court's conclusion that the INS farm and ranch check practices result in the seizure of an entire farm housing community is predicated on the facts as the district court found them. On this record we cannot say that these facts are clearly erroneous.[12] Nonetheless, the seizure conclusion is a mixed question of law and fact subject to de novo review on these facts. The district court concluded: "when uniformed officers surround residences with emergency vehicles with flashing lights, approach the houses with flashlights, awaken the occupants, and station officers at all doors and windows, it borders on the incredulous to conclude that people such as the members of the class in this action would feel free to walk away." This conclusion is reinforced by the further factual finding that residents who exited the housing "were apprehended, detained, and interrogated."

The record in this case contains incidents in which Border Patrol agents forcibly intruded, either physically or with a flash-

---

frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!
*Miller v. United States,* 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (expressing principle articulated by William Pitt).

**12.** The INS does challenge the finding that the ranch checks are conducted without any individualized suspicion as to the presence of illegal aliens in the checked units. The district court's finding to the contrary is amply supported in the record through the testimony of the INS Border Patrol agents.

As the district court recognized, the Border Patrol Agents themselves presented conflicting evidence on the amount of information they obtained prior to initiating farm and ranch checks. For example, Agent Turner testified he never had any specific information in advance that identified a particular suspect or dwelling for a ranch check since at least 1974. Others indicated that they relied on notoriety or the "reputation" of a particular camp. Supervising

Agent Minyard echoed these comments, noting that he normally did not refer to records of prior apprehensions in determining whether to initiate a check, and conceding that any information the Sector offices might receive from complaining witnesses was systematically destroyed and unavailable even after this suit was filed. He admitted that the decision to initiate ranch checks was sometimes based on no specific information and sometimes just on proximity to a migrant worker housing unit. Even in those situations where agents claimed to be acting on prior anonymous tips, the tips often were vague references to geographic areas or farm locations. Finally, the agents testified that it was INS policy to conduct complete sweeps of all community residences, with or without information as to specific residences. For example, Agent Minyard, on whom many of the other agents relied exclusively for information to commence a check, testified that a sole factor in approaching a particular residence was whether the lights were on.

light, into the housing units.[13] Looking at the entire record, especially the findings that the access roads were sealed, the means of egress from the individual units were surrounded and those who left were seized, we affirm the district court's conclusion that a seizure of the entire unit is routinely accomplished. Moreover, the Supreme Court's opinion in *INS v. Delgado* only strengthens the validity of the district court's seizure conclusion.

In *INS v. Delgado,* — U.S. —, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Supreme Court held that INS worksite interrogations conducted pursuant to warrants do not violate the Fourth Amendment. The *Delgado* opinion rejected a contrary holding by this circuit wherein we had held that such factory surveys resulted in a seizure of the workforce. The Court also reversed our alternate holding that employee questioning must be based on particularized suspicion.

In dismissing the seizure-of-the-workforce theory the Supreme Court discounted the plaintiff's evidence that employees were not free to leave the factory.[14] The Court then held that: "if mere questioning does not constitute a seizure when it occurs inside the factory, it is no more a seizure when it occurs at the exits." If INS agents were lawfully conducting questioning, pursuant to a warrant, inside the workplace, then similar conduct is permissible at points of egress.

On the issue of particularized suspicion of illegal alienage, the Supreme Court found that none of the individual encounters rose to the level of a detentive interrogation. *Id.* 104 S.Ct. at 1764. According to the Court, the brief encounters only amounted to "questioning" that did not involve any reasonable apprehension of, or actual detention by the INS agents. Under the "seizure" test articulated in *Delgado: "Unless the circumstances of the encounter are so intimidating* as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id.* at 1763 (emphasis added).

Two material distinctions between *Delgado* and the present case are noteworthy. First, unlike *Delgado,* the INS agents do not obtain any form of warrant for ranch and farm checks. As the district court found, the INS agents base their decision to check on a random basis without any current articulable suspicion that particular units will contain illegal aliens. Also unlike *Delgado,* the INS systematically fails to obtain the consent of the owner of the farm housing. A second distinction between the factory surveys in *Delgado* and farm checks is the materially different forum in which these searches take place—the workplace versus the home. Although the INS persists in contending that farm housing is part and parcel of the workplace and should be treated similarly, the simple truth is that the INS itself has recognized that they are dissimilar. If the INS truly thought that the occupants of farm housing were living at the workplace then the INS would be obliged to seek the consent of the employer—not the occupant—to obtain access. The measure of protection

---

13. For example, one agent testified that his "customary procedure" for obtaining consent was to grasp the belt of the person responding to the door. In another incident, class member Sally Wilson testified that on one occasion she was awakened by the flashlight of an agent, standing in her bedroom doorway, who then attempted to pull the blanket off her bed to ascertain if she was alone. In another episode, Ms. Wilson was making a pie in her kitchen when INS agents fanned around her residence, stationed themselves at all windows and doors, and peered into her home. As she was staring at the face of an agent looking through the window, the agent yelled that everything was okay because it was an "American family." These and other incidents demonstrate that the atmosphere surrounding these early morning or nocturnal visitations is indeed intimidating to those residing in the farm housing units.

14. *See* 104 S.Ct. at 1764 n. 6. The Court was only able to find one piece of evidence, contained in a deposition, that agents attempted to restrain a worker from leaving the factory. According to the Court, this was "an ambiguous, isolated event."

accorded the home under the Fourth Amendment is.qualitatively different from that afforded the workplace under *Delgado*. "[T]he employers' expectation of privacy in the plant setting ... certainly is far less than the traditional expectation of privacy in one's residence." *Id.* at 1767 (Powell, J., concurring). Significantly, the *Delgado* opinion's reliance on the permissibility of questioning within the open interior of the workplace to justify questioning at the workplace exits is clearly inapplicable to the home setting.

2.

■ In the alternative, the district court held that under the circumstances of these farm checks, any consent given by the occupants was not voluntary. The government has the burden of proving voluntary consent. *Schneckloth*, 412 U.S. 218 at 248, 93 S.Ct. 2041 at 2058, 36 L.Ed.2d 854 (1973) (state must show voluntariness "when the subject of a search is not in custody"). On appeal, we can reverse the district court's consent finding "only if in viewing the evidence in the light most favorable to the [plaintiffs]," the finding is clearly erroneous.[15]

■ The district court listed the following factors as supportive of its finding that, under the standard practices applicable to ranch and farm checks, any consent given by the occupants was not voluntary: the uniform failure of the agents to advise the occupants of the right to refuse; the inherent fear that the residents of the camp have of uniformed officers because of their Mexican heritage; the limited lingual and educational background of the housing occupants; the early morning or late evening hours of the checks; and the occupant's knowledge of the "power which INS has in dealing with them" as opposed to the average citizen. *LaDuke*, 460 F.Supp. at 163 (citing *Marquez v. Kiley*, 436 F.Supp. 100, 113–14 (S.D.N.Y.1977)). Citing the show of official force and the

vulnerable nature of the migrant workforce, the district court found that the government had not met its burden in showing voluntary consent to search. When placed against the court's other factual findings and the record as a whole, the district court's factual finding of involuntary consent when the occupants are confronted with the standard pattern of conduct in a ranch check is not clearly erroneous.[16]

Courts have referred to identical or similar factors as probative on the factual question of the voluntariness of consent to search. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling"; failure to inform of right to refuse consent probative on voluntariness); *United States v. Mayes*, 552 F.2d 729 (6th Cir.1977) (minimal schooling); *United States v. O'Looney*, 544 F.2d 385, 388 (9th Cir.) (business sophistication), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976); *United States v. Rodriguez*, 525 F.2d 1313, 1315–16 (10th Cir. 1975) (lack of fluency in English); *United States v. Marshall*, 488 F.2d 1169, 1187–89 (9th Cir.1973) (show of force by armed officers; display of authority); *Harless v. Turner*, 456 F.2d 1337, 1338 (10th Cir.1972) (defendant awakened by numerous officers at early morning hour); *Marquez v. Kiley*, 436 F.Supp. 100, 113–14 (S.D.N.Y.1977). The district court's finding of involuntary consent also finds support on this record in that the INS did not meet its evidentiary burden to prove consent; the record demonstrates "no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *cf. Gomez v. Turner*, 672 F.2d 134, 141 (D.C. Cir.1982) (" 'seizure' occurs when a police officer, by force or show of authority, restrains the liberty of a citizen"). The atmo-

---

**15.** *Id.* at 227, 93 S.Ct. at 2047; *United States v. Cawley*, 630 F.2d 1345, 1349 (9th Cir.1980).

**16.** While the district court's link between Mexican culture and an inherent fear of uniformed officers is a questionable stereotype, it was not the sole basis for the court's decision.

sphere surrounding the INS's standard farm check practices depicts a substantial show of official force. The tenor of the injunction reveals that it is aimed at preventing involuntary consent prompted by shows of force or claims of lawful authority. *LaDuke,* 560 F.Supp. at 165.

### C.

The government challenges both the appropriateness of injunctive relief and the breadth of the injunction issued. We affirm the issuance of an injunction and reject the INS's overbreadth arguments as raised in the district court.

### 1.

■ The district court correctly stated the basic prerequisites for issuance of a permanent injunction as "the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *LaDuke,* 560 F.Supp. at 162 (citing *O'Shea,* 414 U.S. at 502, 94 S.Ct. at 679). The district court then found that plaintiffs had prevailed on the merits and the balance of the equities favored injunctive relief. *LaDuke,* 560 F.Supp. at 162. The court then determined "what form of [equitable] relief is appropriate." *Id.* Twenty days after issuance of the original injunction, the district court amended the injunction, an act clearly within its jurisdiction, *Safe Flight Instrument Corp. v. United Control Corp.,* 576 F.2d 1340, 1343 (9th Cir.1978), to clarify that the injunction "is not intended to prohibit clearly consensual entries such as those made for the purpose of gathering an arrested alien's belongings." *LaDuke,* 560 F.Supp. at 165 n. 1.

From the preceding discussion of the merits of plaintiffs' case, the district court's conclusion on the appropriateness of injunctive relief is sound. From the previous discussion on the plaintiffs' standing, it should be evident that plaintiffs face a "likelihood of substantial and immediate irreparable injury." *Lyons,* 461 U.S. at 111, 103 S.Ct. at 1670 (quoting *O'Shea,* at 502, 94 S.Ct. at 679). The likelihood that class members will suffer prospective injury is buttressed not only by the defendants' past conduct but also by the defendants' avowed future intent.

The district court's conclusion that the remedies at law are inadequate is also sound. As the Supreme Court stated in rejecting the application of the exclusionary rule in deportation hearings, the deterrent value of the rule "is undermined by the availability of alternative remedies for institutional practices by the INS" in contravention of the Fourth Amendment. *INS v. Lopez-Mendoza,* —— U.S. ——, 104 S.Ct. 3479, 3488, 82 L.Ed.2d 778 (1984). In particular, "[T]he possibility of declaratory relief against the agency thus offers a means for challenging the validity of INS practices, when standing requirements for bringing such an action can be met." *Id.* 104 S.Ct. at 3488.

The only other remedy at law available to the class is an action for damages.[17] For various reasons the district court found that damages were not available to the individual class representatives. The plaintiffs have not appealed this ruling nor has the INS asserted that damages constituted an adequate alternative remedy at law for plaintiffs individually or as a class. The high likelihood that the violations will recur absent issuance of an injunction counsels in favor of equitable rather than legal relief. In addition, the district court certified this suit as a class under Rule 23(b)(2), which literally permits only class applications for injunctive or declaratory relief.[18] *See* Fed. R.Civ.P. 23(b)(2).

### 2.

■ The INS further contends that the injunction is overbroad. We reject those challenges to the breadth of the injunction unsuccessfully raised in the district court. We decline to express any opinion on any overbreadth claim not originally addressed

---

**17.** We do not mean to suggest that injunctive relief is limited to those situations in which the exclusionary rule is unavailable.

**18.** The complaint sought certification under Rule 23(b)(1)(A) but the court did not certify such a class.

to the district court. Given the district court's extensive experience with the facts and litigants, sound principles of judicial administration indicate that any further challenges to the scope of the injunction be directed initially to the jurisdiction of the district court.

The amended injunction has three separate components barring: (a) warrantless entries of farm dwellings to search or arrest unless the officers have "clear[ ] consent" or probable cause; (b) warrantless arrests or searches of migrant farm housing residents unless based on probable cause; and (c) "stopping, detaining, and interrogating [class members] by force, threats of force or a command based upon official authority" absent a warrant, probable cause, or reasonable suspicion based on articulable fact that the person is an alien illegally within the United States. The injunction does expressly permit, however, the nondetentive interrogation of suspected aliens concerning their lawful presence in the United States. *LaDuke,* 560 F.Supp. at 165.

According to the INS, the first component of the injunction is overbroad because it allegedly bars consensual searches. This argument was previously made in the district court after the issuance of the original injunction, and any ambiguity on this matter was clarified by the amended injunction. Under the amended injunction, clearly consensual searches are expressly permitted. The first component of the injunction is directed to farm housing entries. If anything, this component's simple language overstates the bounds of the INS's authority to enter housing units with or without a warrant. In sum, however, we think the plain language of the first component provides ample flexibility for INS searches while preserving class members' reasonable expectations of privacy.

The INS finds the second component of the injunction legally "unremarkable" but claims it would cast a chill on officer performance because they are not fully conversant in the legal standards for searches and seizures. We sympathize with the INS's educational task in keeping its officers abreast of the developments in the fast-moving world of the Fourth Amendment. When the Chief Patrol Agent for the Spokane Sector testified in the district court, however, he stated that house-to-house searches of farm dwellings would not be permitted under INS policy without individualized suspicion as to each searched dwelling. The testimony of his agents, on the other hand, indicated that house-to-house searches without information as to specific dwellings was a standard practice. Consequently, we cannot affix the entire blame for the educational difficulties of the INS solely on the prolix language of the numerous judicial interpretations of the Fourth Amendment. We find the plain language of the injunction's second component sufficiently clear to convey the Fourth Amendment's core commands to all who wish to listen.

The third injunctive proscription is challenged by the INS because it bars detentive stops without articulable suspicion of both alienage and illegal presence in the United States. For reasons previously explained, in this nonborder context the Fourth Amendment requires at least articulable suspicion of both alienage and unlawful presence for a detentive stop. The government's overbreadth claim completely ignores the language of the injunction's third component, which permits nondetentive interrogations as to illegal presence based solely on reasonable belief of alienage.

Lest there remain any doubts, the amended injunction as it currently stands does not infringe upon the legitimate use of law enforcement practices within the migrant worker farm housing community in the Spokane Sector. As the district court stated in the course of the trial, none of the parties disputed the legitimate enforcement needs of the INS within this community. As the district court found, however, the use of ranch checks by the INS in the Spokane Sector cannot be viewed as casual encounters between residents and law enforcement. We agree with the district court's conclusion that

farm checks, as described by the witnesses, run afoul of the Fourth Amendment.

### D.

■ The bulk of the INS's certification contentions are merely adjuncts to the INS's challenges to class standing. Nonetheless, assuming that the propriety of the district court's certification decision has been·placed at issue by the government on appeal, the district court did not abuse its discretion in certifying the plaintiff class. *See Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 479 (9th Cir.1983) (standard of review for class certification is "abuse of discretion or impermissible legal criteria").

Rule 23(a) sets forth the four minimum requirements of (a) numerosity (b) commonality (c) typicality, and (d) adequate representation. Fed.R.Civ.P. 23(a). Only commonality and typicality have been questioned by the INS. The position of the INS is without merit. Plainly, the constitutionality of the INS ranch check technique as it affects the defined class is a "question of law or fact common to the class." *Id.*

Of course, if material variations exist as to the law or facts involved with individual class member injuries, then the commonality requirement would not be met. *In re Hotel Telephone Charges,* 500 F.2d 86, 89 (9th Cir.1974). The district court's ultimate factual finding of a uniform pattern of INS conduct, upon which the court premised its legal conclusions, reinforces the court's prior conclusion that there are no material differences among individual class grievances. Accordingly, the district court can hardly be held to have abused its discretion in finding commonality for class claims.

Similarly, the typicality of the class representative's claims was vigorously litigated in the district court and the district court did not abuse its discretion in finding that the named plaintiffs' claims are typical of those raised by the class as to the propriety of injunctive relief. The minor dif-

ferences in the manner in which the representative's Fourth Amendment rights were violated [19] does not render their claims atypical of those of the class. We agree that the representatives' claims fairly encompass the Fourth Amendment claims of the remaining class members.

Finally, *citing Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir.1981) (after certification court may divide class into subclasses), the INS contends that the class certified by the district court is actually composed of discrete subclasses which require separate treatment by the court. We reject the INS's attempt to raise the subclass issue for the first time on appeal. The district court did not abuse its discretion in failing to address sua sponte the possibility of subclasses under Federal Rule of Civil Procedure 23(c)(4)(B) when the subclass proponent fails to request such a procedure, *see United States Parole Commission v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980), and no obvious basis for subclass creation, such as conflicting interests within the class, is apparent on the record.

### E.

After two days of hearings the district court awarded plaintiffs' counsel approximately $300,000 in attorney fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. The fee application of the various counsel for plaintiff class was premised on the availability of fees under either § 2412(b) or § 2412(d)(1)(A). The distrit court held plaintiffs' counsel entitled to fees under both provisions. The district court then rigorously analyzed the various fee applications, awarded reasonable hourly fees of $100 to Mr. Fox and $125 for Mr. Ginsberg, and applied a 20% multiplier based on the risk that the attorneys' work on such a protracted case would go uncompensated.

---

**19.** LaDuke's privacy was violated by a flashlight search of his tent and a physical trespass while the Garcias' privacy was violated only through trespass. Other class members suffered similar violations of their Fourth Amendment rights. *Cf.* Deposition of Ramon Castillo (unauthorized physical entry by agents, lights shined through windows).

■■■ The government now challenges both statutory bases of entitlement under the EAJA found by the court below. The standard of review applied in this circuit to a district court's ruling on attorney fees is abuse of discretion. *Foster v. Tourtellotte,* 704 F.2d 1109, 1110–11 (9th Cir.). Nonetheless, issues regarding the proper interpretation of the EAJA are subject to *de novo* review. *Lauritzen v. Lehman,* 736 F.2d 550, 553 (9th Cir.1984).

The district court rejected plaintiffs' claim to fees under § 2412(b) which had been raised under a "common law benefit" theory. The district court's alternative finding of fee entitlement under the analogous "statute" prong of § 2412(b) is no longer consistent with Ninth Circuit precedent. *See Lauritzen v. Lehman,* 736 F.2d 550, 553–59 (9th Cir.1984).

■■■ The district court's separate ruling on entitlement under 28 U.S.C. § 2412(d)(1)(A), however, did not constitute an abuse of discretion. The court's finding that plaintiffs were prevailing parties [20] has not been challenged on appeal. The INS largely contests the district court's finding that the government's position was not "substantially justified." [21]

Following *Rawlings v. Heckler,* 725 F.2d 1192 (9th Cir.1984), the district court found the government's position lacked a reasonable basis in law and fact because the law regarding the need for articulable suspicion was clear, the defendants failed to follow both the law and their own policies, and the INS needlessly protracted the litigation by denying routine INS practices. The district court, having a unique perspective earned from tireless effort in this protracted litigation, did not abuse its discretion in finding an absence of substantial justification.

■■■ Finally, the INS charges that the hourly fee award ($100 and $125) to class counsel unreasonably exceeded the normal fee of $75 per hour under the EAJA. The EAJA authorizes exceeding the $75 "cap" on attorney fees based on either a cost of living increase or a "special factor, such as the limited availability of qualified attorneys for the proceedings." 28 U.S.C. § 2412(d)(2)(A)(ii). The court did not abuse its discretion in finding a special factor existed for breaching the $75 cap based on expert testimony. *Accord Action on Smoking and Health v. CAB,* 724 F.2d 211, 219 (D.C.Cir.1984). The court relied on a concurring opinion in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), to support the position that the inordinate risk of no fee award was sufficient to justify a multiplier. The contingent nature of fee awards under the EAJA has been held a "special factor" permitting a multiplier. *Action on Smoking and Health v. CAB,* 724 F.2d 211–218 (D.C.Cir.1984) (citing *Copeland v. Marshall,* 641 F.2d 880, 905–08 (D.C.Cir.1980) (en banc)); *Coleman v. Block,* 589 F.Supp. 1411, 1421 (D.N.Dak.1984); *Local 3–98, Int. Woodworkers of America v. Donovan,* 580 F.Supp. 714, 717 (N.D.Cal.1984). Consequently, the district court properly took this special factor into account in adjusting the plaintiffs' attorney fees.

### IV.

We affirm the district court's issuance of an amended injunction and the award of fees and costs.

---

**20.** The district court rejected INS arguments that the dismissal of some defendants, denial of a preliminary injunction, failure to settle the case, and limited nature of the injunction issued operated to deprive plaintiffs of prevailing party status.

**21.** The court also found no "special circumstances" rendered an award unjust and the INS has not contested this finding.