**COMMUNITY FOR CREATIVE NON-VIOLENCE, et al., Plaintiff,**

**v.**

**UNKNOWN AGENTS OF THE UNITED STATES MARSHALS SERVICE, et al., Defendants.**

**Civ. A. No. 92–0199.**

United States District Court,
District of Columbia.

June 25, 1992.

See also 791 F.Supp. 1.

**8**

---

Margaret M. Zwisler, Lois G. Williams, Richard A. Ripley, Howrey & Simon, Washington, D.C., for plaintiff.

Jay Stephens, John C. Cleary, Office of the U.S. Atty., Washington, D.C., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

Plaintiffs are the operators of the Community for Creative Non–Violence homeless shelter ("CCNV shelter") at 425 Second St., N.W., Washington, D.C. along with the class of homeless people who were present at the shelter in the early morning hours of January 9, 1992. Plaintiffs claim that the Defendants, the United States Marshals Service for the Superior Court of the District of Columbia ("Marshals"), violated their Fourth Amendment rights when they conducted a pre-dawn 'raid' of the shelter that day. After conducting a trial in this case, it is clear that the Marshals' actions did violate the Plaintiffs' constitutional rights. Therefore this Court will enter a judgment for the Plaintiffs and order appropriate relief.

## INTRODUCTION

The Court has observed three days of testimony, a videotape, and numerous documentary exhibits in this case. It is helpful, then, to begin by noting what it not at issue in this case. First, Plaintiffs in this case are not alleging that the Marshals used any type of excessive force either on January 9, 1992 or in any previous encounter at the CCNV shelter. There has been absolutely no evidence to suggest that the Marshals in this case engaged in any physical abuse or misused force. Second, this case neither presents the Court with the need nor the opportunity to make broad judgments concerning the fairness and restraint of the United States Marshals Service. It is clear to this Court that the United States Marshal Service is an elite federal law enforcement organization. The Marshals are charged with the task of locating fugitives and executing outstanding arrest warrants for those fugitives. That task is both difficult and dangerous. Therefore, it is beyond dispute that the Marshals must have certain latitude in executing arrest warrants within the means permitted under the constitution. It is clear both from the evidence presented in this case and from the Marshals Service's past actions that, in general, the Marshals discharge their responsibilities in a serious and professional manner.

This case only requires the Court to examine the conduct and policies of the Marshals as they relate to the CCNV shelter located at 425 Second Street. On January 9, 1992 that conduct did not meet the constitutional standard owed the Plaintiffs. Moreover, in the absence of a change from past practice, the Marshals will likely continue to violate the rights of the residents of that shelter—many of whom are among this country's most defenseless citizens. Accordingly, the Marshals' procedures and actions for executing arrest warrants at the CCNV shelter must be altered to conform with constitutional mandates.

## FINDINGS OF FACT

### A. The "Raid"

Plaintiffs' complaint is based on the actions of the Marshals on January 9, 1992.

The previous day the Marshals had received a tip from a confidential informant that Earl Hughes, a fugitive, was staying at the CCNV shelter. On January 8, 1992 the Deputy Marshal who was assigned to the Hughes case assembled a group of ten Marshals to plan the next morning's activities. He informed them that they would be looking for Hughes at the CCNV shelter the following day. He also stated that the Marshals "might have to have people identify themselves [and] show IDs." Tr. Vol. III at 6–8; Deposition of Floyd White at 42–43. It was agreed at that time that the Marshals would take a printout of all fugitives on the chance that some of the others might also be at the shelter. This Court finds that from the outset the Marshals intended to look not only for Hughes but to conduct a general sweep of the shelter looking for any fugitive who might be there.

The next morning the Marshals assembled and proceeded to the CCNV shelter. This Court credits the testimony of the CCNV staff members who were present in the shelter that morning. That testimony reveals that the following events occurred. In the early morning hours of that day nearly 500 homeless people were sleeping in the '2 South' and Emergency drop-in areas of the shelter, having spent the previous winter night there. Mr. Louis Juluke, the CCNV staff person on duty, testified that the entrance to the shelter is only opened once every half hour from 12:00 am. to 6:00 a.m. At 5:30 am. on that morning ten Marshals came through the only entrance to the CCNV shelter and approached the glass enclosed front desk, or 'bubble.' The Deputy Marshal in charge of the operation testified that the Marshals purposely came at 5:30 am. because they knew the door would be unlocked and that they could gain entry to the lobby at that time without having to be let in. Tr. Vol. II at 164.

When they entered the shelter the Marshals had with them not only a picture of Earl Hughes and the warrant for his arrest, but computer printouts listing thou-

sands of people for whom there were outstanding arrest warrants in the D.C. metropolitan area. *See* Tr. Vol III at 69. Four Marshals approached Juluke in the bubble; they showed him the picture of Hughes, and one asked "who's running this show." Tr. Volume I at 19. Juluke responded that he had never seen the person in the picture and that his supervisor was Rodney Hammond. The Marshals left the bubble and conferenced outside in the lobby. A group of Marshals then proceeded up the stairs to the 2 South area of the shelter, where the confidential informant had told them that Hughes would be located. Juluke did not protest as one group of Marshals proceeded up the stairs and another left for the basement. Neither did he give the Marshals permission to proceed inside the shelter. Juluke did not affirmatively attempt to stop the Marshals because he felt he had no choice in the matter.

The 2 South section of the shelter houses male residents who are employed. In the early morning of January 9, 1992 there were over 300 Plaintiff class members who had been sleeping in 2 South for the night. The Marshals entered the 2 South section without the consent of the person on duty there, they showed that CCNV staff person the picture, and asked if Earl Hughes was in 2 South. The CCNV member informed the Marshals that he did not recognize the person in the picture and that there was no Earl Hughes in 2 South.

Despite being told that the person the Marshals were seeking was not present, the Marshals demanded to see the records of all the people in 2 South. CCNV keeps a Rolodex file, which it regularly updates, containing the names of all 2 South residents.[1] The staff member showed the Rolodex and two other rosters to the Marshals. Earl Hughes' name was not listed on any record at the desk. One Marshal then told the CCNV staff member "We're going to check anyway." Tr. Vol. I at 49. Another Marshal told a CCNV staff person to turn on the lights and to use the public address system to tell the 2 South residents that the Marshals were present and that the residents should have identification ready to be checked if they wanted to leave the building. Tr. Vol. I at 51–53.[2] The CCNV staff person obeyed the Marshal's order, and he woke up the 2 South residents by turning on the lights and making the required announcement.

At the same time that this was occurring at the desk, other Marshals were walking back into the sleeping area of 2 South. Those Marshals wanted to make sure that there was no back exit to the shelter.[3] In addition, the Marshals entered the private cubicles of certain residents, and woke them up[4] to check their i.d.'s and their faces against the picture of Hughes. The Marshals checked certain of those individu-

1. At its weekly intake, CCNV conducts screening for the 2 South area. At that time each resident must produce proof of employment, identify himself, and have his name placed in the Rolodex. At that time CCNV also conducts a "bar" screen to ascertain whether those who are seeking shelter in 2 South have ever been barred from the shelter for bad behavior. CCNV members testified that, if known to the CCNV staff, any type of dangerous criminal activity, including drug related activity would result in being barred from the shelter.

2. The Marshals' testimony at trial was contradictory on this point. They claimed that the CCNV staff spontaneously offered to make this announcement and that the shelter residents voluntarily came forward to produce identification. This Court does not credit the Marshals' testimony on this point. The Marshals would have this Court believe that they went into the shelter with no game plan and that all of the

events of that morning 'just happened.' That account contradicts both sound law enforcement practice and the Marshals' own actions in meeting the evening before to discuss the raid and bringing the computer printout into the shelter with them when they entered that morning.

3. The testimony indicated that the exit by the front desk was the only door that was not alarmed or locked. Thus, the Marshals positioned themselves at the only avenue of egress to 2 South.

4. Although the Marshals did tap or gently shake some residents to wake them up, it bears repeating that there is no allegation that the Marshals used excessive force. The evidence clearly demonstrates that the Marshals neither drew their weapons nor engaged in any rough tactics in carrying out the operation that morning.

als' i.d.'s against the master printout of all outstanding arrest warrants.

The group of Marshals who had remained at the only exit to 2 South began checking the identification of every person in the line-up or who attempted to leave the premises. The residents who wished to leave—many for work—had to form a line starting at the door. At the head of that line, one Marshal blocked the exit and two others set up stations at the front desk. These Marshals had copies of the computer printout listing fugitives both according to name and address. One of the employees of the shelter at some point began to videotape what was transpiring. The videotape and testimony demonstrated that every person attempting to exit the room, regardless of race, age, or appearance was required to present identification. One resident of 2 South testified that a Marshal informed him that if he tried to leave without showing identification he would be arrested. Tr. Vol. I at 79. The Marshals checked each i.d. presented against the list of outstanding warrants. If the name did not produce a "hit," the Marshal at the door would step aside and the person would be allowed to leave. Five fugitives were actually found and placed under arrest.[5] The testimony concerning the number of 2 South residents forced to show an i.d. ranged from slightly over 100 to nearly 200. The Marshals stayed at the exit to 2 South and checked i.d.'s for approximately one and one half hours.

At the same time as the events in 2 South were occurring, a second group of Marshals had proceeded to the Emergency Drop-in area of the shelter. The purpose of this area is to provide emergency overnight shelter for homeless individuals during the winter months. Over 100 homeless individuals were present in the Drop-in area on the morning of January 9, 1992. The Marshals approached the locked steel mesh door of the Drop-in section and told Greg Shea, the CCNV desk attendant, that they were searching for the man in the picture. Shea opened the door only to get a better look at the picture. Several Marshals pushed past him and entered the interior of the Drop-in section without his consent. Tr. Vol. II at 16. One of the Marshals accompanied Shea to check the Drop-in roster. Earl Hughes' name did not appear. The Marshals then told Shea to turn on the lights because they were going to "check" anyway. Tr. Vol. II at 18. Shea asked if he could call his supervisor, and the Marshal responded that he "could call anyone he wanted so long as he turned the lights on first." Tr. Vol. II at 18–19. Shea, feeling he had no choice, complied.

The Marshals then began going to various beds in the Drop-in area and rousing the residents to see if they could locate Hughes. The Marshals also informed the CCNV staff member that no one would be permitted to leave the Drop-in area without showing identification. For the next hour no person was permitted to leave the Drop-in area without producing identification which was checked against the computer printout of all outstanding warrants.

Shortly after the Marshals began checking i.d.'s in both areas of the shelter, Plaintiff Carol Fennelly, a director of CCNV, and Plaintiff Cliff Newman, a CCNV team leader, were alerted. Both of these people are known by the Marshals to be senior CCNV officers who live at and operate the shelter. Mr. Newman, whose testimony is credited by the Court, loudly announced to 2 South residents that he could not advise them whether or not to disobey the Marshals, but that he personally believed that what they were doing was illegal and that CCNV was going to pursue the matter. He stated that the only reason that the Marshals were still permitted to stay at the shelter was that "they are the ones with the guns." Tr. Vol. I at 150. Newman also approached the Marshals directly and vehemently argued that what they were doing was impermissible.

Plaintiff Fennelly, whom the Marshals knew to be a CCNV leader, also confronted

---

5. The fugitives arrested were wanted for offenses ranging from escape from detention to failure to pay a $60 traffic fine.

several Marshals. First, she approached the Marshals on 2 South and "demanded that the Marshals leave" stating that she also believed that what they were doing was "illegal and unconstitutional." Tr. Vol. II at 72, 72–75. When the Marshals ignored her request and continued to check i.d.'s, she demanded to know who was in charge of the operation. Fennelly, who took notes, located the "Deputy in charge" in the Drop-in section and "told him to get out of the building." Tr. Vol. II at 74. A heated exchange between Fennelly and the Deputy Marshal ensued, during which the Deputy Marshal informed Fennelly that she would be arrested if she continued to interfere with the operation in progress. The Deputy Marshal himself testified that the very vehemence of Fennelly's request that he leave the premises was a factor in his decision *not* to leave and to continue examining i.d.'s. Tr. Vol. III at 22. Finally, Plaintiff Fennelly asked what the Marshals would do to anyone who refused to produce identification. As her notes reflect, the Marshal responded, "take them in." Tr. Vol. II at 74.

The Marshals did not leave the CCNV shelter until after 7:00 a.m. Hughes was not found in the shelter. On the way out of the shelter both the video tape and testimony show that the Deputy Marshal in charge stated to Fennelly that the Marshals "might be back tomorrow, and if the doors are locked, they [can] come down." Tr. Vol. II at 79. The Plaintiffs filed this action seeking to prevent such dragnet raids.

### B. Standing

Fennelly also testified credibly as to the harms which have befallen both CCNV and the class of homeless Plaintiffs as a result of the January 9 incident and the threat of future incidents at the shelter. Tr. Vol. II at 85–89. Fennelly testified that CCNV's ability to fund its activities has been damaged by the raid and the resulting perception that the shelter harbors fugitives. CCNV accepts no federal money and depends on private donations to provide the wide range of services available at the shelter.

Fennelly also testified as to the damage that has been done to the trust relationship between the CCNV shelter and the homeless people in the shelter. *Id.* at 87. *See Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Both CCNV and the shelter residents are hurt when such fragile bonds are damaged. To fulfill its mission of providing safe, reliable shelter for the homeless, CCNV must maintain the trust of the people it attempts to bring in off the streets. If homeless people cease believing that the CCNV shelter can provide them housing free from unreasonable search and seizure, they will not come there and CCNV will be hindered in fulfilling its mission.

For the class of homeless Plaintiffs, the limited space available at the CCNV shelter represents their only chance to get off the streets. As Fennelly testified, the vulnerability of many homeless people and their tenuous relationships with law enforcement officers is a major factor in their day to day life. Indeed, the testimony and the very demeanor of the residents as they recounted the events of January 9 demonstrate that these types of raids do inflict significant emotional trauma upon this fragile class of citizens. Tr. Vol. II at 88. One witness testified that the events of January 9, 1992 upset him so much that he was forced to telephone his Alcoholics Anonymous sponsor to "stay dry." Tr. Vol. I at 79. This Court finds that, if the Marshals continue to conduct these types of "raids," innocent homeless people who depend on the shelter as their only source of housing will be forced to return to the streets.

Therefore, both CCNV and the class Plaintiffs' allegations concerning injury and redressability have been amply vindicated by the facts as proven at trial. *See Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir.1985); *Goff v. Nix*, 803 F.2d 358 (8th Cir.1986). Thus, this Court must reach the merits of the Plaintiffs' claims.

## CONCLUSIONS OF LAW

### I. Fourth Amendment Claim

 Both sides have agreed that the Court has correctly articulated the applicable law in its opinion of May 5, 1992. *See Community for Creative Non–Violence v. Unknown Agents of the United States Marshals Service,* 791 F.Supp. 1 (opinion denying in part and granting in part Defendants' Motion to Dismiss) (*"CCNV"*). The holding of that opinion is simple. Homeless citizens are entitled to no less and no more protection under the Fourth Amendment than those in our country who have housing. Courts must balance the law enforcement interest in executing fugitive arrest warrants against the privacy interests of innocent third parties who depend on the CCNV shelter as their only source of housing. Thus, this Court held that the Marshals may enter the CCNV shelter to execute an arrest warrant for a fugitive whom they have reason to believe lives there. *See Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388–89, 63 L.Ed.2d 639 (1980). In doing so, the Court also held that their actions must be consistent with that particular fugitive's use of the shelter as his or her home, and their actions may not unreasonably infringe on the rights of innocent third parties who live in the shelter. *See Steagald v. United States,* 451 U.S. 204, 212–213, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981); *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 340, 62 L.Ed.2d 238 (1979); *CCNV,* at 4–6.[6] The Marshals' actions in this case clearly ex-

ceeded these fourth amendment safeguards.

 The Marshals employed what can only be termed as "dragnet" tactics in their search of the shelter. The Marshals effectively blocked all possible exits to 2 South and the Drop-in areas of the shelter for almost 90 minutes. During that time, no person was permitted to exit the shelter without showing identification. In addition, the Marshals went out into the enclosed sleeping cubicles of 2 South and randomly woke up residents in 2 South and the Drop-in areas to check their identification. The Marshals checked the identification of nearly two hundred homeless people staying at the shelter that evening. All residents attempting to exit the shelter were required to present identification regardless of the fact that, because of clearly discernible differences in appearance, they could in no way be thought to be the fugitive Hughes. Thus, the Marshals had no articulable reason to believe that many of the nearly two hundred people checked for identification were Earl Hughes. For many of these law abiding homeless people, the CCNV shelter represented their only opportunity to get off the streets on a winter night. As this Court held previously, "a person who stays at a homeless shelter because he cannot obtain other housing does not do so at the loss of his most basic rights of privacy and freedom from unreasonable government intrusions." *CCNV,* at 5. Even had the Marshals been searching only for Earl Hughes that morning, the scope of their warrant-

---

6. This Court also held that both CCNV and the class of homeless residents have a reasonable expectation of privacy in the areas of the shelter invaded by the Marshals. That holding was supported by the evidence adduced at trial. The testimony showed that CCNV is the exclusive licensee of the shelter premises, that many of the CCNV members, including Plaintiff Fennelly, live at the shelter, and that CCNV has the power to exclude people from the shelter. *See Rakas v. Illinois,* 439 U.S. 128, 143–144 n. 12, 99 S.Ct. 421, 430–31, 58 L.Ed.2d 387 (1978). In addition, the testimony showed that the homeless people who live in the shelter had an actual expectation of privacy because "the shelter was, for them, the most private place they could possibly have gone—the place most akin to their 'home.'" *CCNV,* at 6. As this Court previously

held, that expectation is reasonable because "[t]o reject this notion would be to read millions of homeless citizens out of the text of the Fourth Amendment." *Id. See also Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967) (legitimate expectation of privacy for conversation in public phone booth); Michael D. Granston, Note, *From Private Places to Private Activities: Toward a New Fourth Amendment House for the Shelterless,* 101 Yale L.J. 1305, 1320–1321 (1992) ("denying Fourth Amendment protection to [shelterless] areas ... is tantamount to denying the shelterless any area where they may be free from governmental searches."); Elizabeth Schutz, Note, *The Fourth Amendment Rights of the Homeless,* 60 Fordham L. Review 1003, 1028–1033 (1992).

less incursion into the "homes" of innocent third parties exceeded permissible limits.[7]

This case involves an even clearer violation of the fourth amendment's limits concerning search and seizure. The evidence at trial demonstrated that even before they went to the shelter, the Marshals contemplated more than a limited search for Earl Hughes. The Marshals planned to check identification against the computer printout of all fugitives in the D.C. area. It was for that reason that they brought with them computer printouts listing every outstanding arrest warrant. It was for that reason that every identification card they received was checked not only against the picture of Earl Hughes but against those computer printouts. It was for that reason that identification was checked regardless of the appearance of the resident.

Most of the names on the computer printout were people whom the Marshals had no reason to believe would be present at the CCNV shelter. Thus, the Marshals used the arrest warrant for Earl Hughes as a 'Trojan Horse'—a device which got them inside the walls of the shelter yet disguised their real reasons for being there. Under these circumstances, the Marshals' actions were beyond the scope of what an arrest warrant for one person thought to be in the shelter would permit.

## II. Affirmative Defense of Consent

The Marshals respond that their actions at the CCNV shelter on January 9, 1992 need not have been consistent with the fourth amendment because they acted only pursuant to the consent of CCNV and the class Plaintiffs. That contention is without merit.

### A. No Consent Was Ever Given to the Marshals

 First, the government has not met its burden of establishing that any consent was ever given for the Marshals' actions at the shelter. See *United States v. Mapp*, 476 F.2d 67, 77 (2d Cir.1973) (collecting cases); *United States v. Sheard*, 473 F.2d 139, 147 (D.C.Cir.1972) ("burden is admittedly a heavy one"). Indeed, the facts clearly indicate that no person ever gave consent to the Marshals that morning. No person ever assented to the Marshals entering the shelter, proceeding to the 2 South and Drop-in areas, waking up nearly 500 residents of the shelter, or checking their identification. The evidence shows that the Marshals proceeded to their stations inside the shelter without permission and ordered the CCNV staff to turn on the lights and make an announcement over the loudspeaker. Once the residents were awake, the Marshals refused to let any resident of the shelter leave without showing identification and threatened that if anyone refused to comply with these requirements they would be arrested. When Carol Fennelly, a CCNV director, repeatedly asked the Marshals to leave the premises, not only did they continue to check the identification of everyone who wished to leave 2 South and the Drop-in areas, but they threatened Fennelly with arrest for "interfering" with the operation. Finally, Cliff Newman, a leader on 2 South, stated that morning that CCNV intended to bring a lawsuit in light of what he clearly believed to be the Marshals' illegal actions.[8]

---

7. As this Court has held, the Marshals do not need a search warrant to enter the CCNV shelter when they have reason to believe a fugitive from a valid arrest warrant is using the shelter as his home. It bears pointing out, however, that in this case the Marshals waited nearly 12 hours after receiving the information on Hughes' whereabouts to appear at the shelter. In addition, both the Marshals Service headquarters and the CCNV shelter are within three blocks of the courthouse. Thus, the Marshals did not face exigent circumstances which would have prevented them from obtaining a search warrant in this case. Had they obtained a search warrant, they would have had the benefit of a detached judicial officer's prior determination as to the conduct in which the Marshals could constitutionally have engaged at the shelter.

8. The Government claims that the people at the front desks consented to the entire operation by opening the doors and showing the Rolodex and rosters to the Marshals. Even were these actions 'consensual,' and this Court finds they were not, as a matter of law such limited consent could not support the broad ranging actions taken by the Marshals that morning. First, the government has not offered sufficient proof to meet its burden of showing this Court

Thus, as a purely factual matter, no consent was ever given to the Marshals to engage in the actions at issue in this case.

## B. Compliance with the Marshals' Orders was Not Voluntary

■ Second, to the extent that the Plaintiffs merely complied with the orders of the Marshals, the Defendants have not shown that this is the type of voluntary and intelligent consent required to waive fourth amendment rights. In making this factual determination, the Court must look to the "totality of all the circumstances." *Schneckloth v. Bustomonte,* 412 U.S. 218, 227–229, 93 S.Ct. 2041, 2047–49, 36 L.Ed.2d 854 (1973); *U.S. v. Maragh,* 756 F.Supp. 18, 21–23 (D.D.C.1991). Considering the totality of the circumstances in this case, compliance with the Marshals' orders was not voluntary.

Consent is not "freely and voluntarily given" when it is gained as a result of acquiescence to an assertion of lawful authority. *Bumper v. North Carolina,* 391 U.S. 543, 548–549, n. 14, 88 S.Ct. 1788, 1791–92, n. 14, 20 L.Ed.2d 797 (1968); *La-Duke v. Nelson,* 762 F.2d 1318, 1329 (9th Cir.1985). How much less voluntary that compliance must be where, as here, it is gained pursuant to a threat by law enforcement officers to act *beyond* their lawful authority. *See Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 329, 99 S.Ct. 2319, 2325–26, 60 L.Ed.2d 920 (1979) (consent not voluntary when obtained pursuant to invalid search warrant). The evidence demonstrated that the residents displayed their identification only because the Marshals ordered them to do so. The Marshals made it clear to the CCNV staff, and through them to the residents, that anyone who refused to show identification and tried to leave the 2 South and Drop-in areas would be placed under arrest. The Marshals, however, had no reason to believe that most of the homeless people checked were either Earl Hughes or had any outstanding arrest warrants. Therefore, they could not have lawfully arrested these people or prevented them from leaving the shelter merely for failing to present picture identification. Thus, the residents of the shelter acquiesced in the identification check only after being threatened with actions beyond the Marshals' authority.

The other circumstances surrounding the identification check also contribute to the finding that the government has not shown a voluntary and intelligent waiver of fourth amendment rights by the residents of the shelter. The residents were awakened in the early hours of the morning by a group of ten armed United States Marshals. *See U.S. v. Talkington,* 843 F.2d 1041, 1048 (7th Cir.1988) (number of officers is a factor); *Harless v. Turner,* 456 F.2d 1337 (10th Cir.1972) (consent not voluntary when person faced by many police officers in the middle of the night). The Marshals, while they were purporting to search only for Hughes, were actually checking the residents' i.d.'s against the broad base of all

that these staff people had the actual or apparent authority to give consent for such an action.

Second, an intrusion conducted pursuant to consent cannot exceed the scope of the consent, and the giver of consent is the master of the scope and may withdraw the consent. *See U.S. v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971); *U.S. v. Prandy–Binnet,* 774 F.Supp. 25 at n. 2 (D.D.C. 1991). The Marshals expanded their invasion of the shelter far beyond the front lobby of the shelter or even the front desks of the 2 South or the Drop-in areas, where the rosters were kept. They not only proceeded to the second floor and the basement, but sent Marshals back into the actual sleeping areas and bathrooms. In addition, Marshals actually entered the enclosed sleeping cubicles of the 2 South residents, woke up those residents and checked their identification. Thus, the Marshals exceeded the physical scope of any consent they may have had to enter the front lobby or to look at the shelter rosters.

In addition, any putative "consent" was clearly revoked by both Fennelly and Newman shortly after the Marshals arrived. The Marshals were explicitly and repeatedly told to cease the operation and leave the shelter by Carol Fennelly, whom the Marshals knew to be the senior CCNV person on the premises. They refused. Newman, a team leader at 2 South, announced that the only reason that the Marshals were still present was because they were armed. The videotape shows clearly, and even the Marshals admitted, that their interaction with the CCNV staff was confrontational, not cooperative. Indeed, so contentious were the Marshals' activities that Fennelly refused to let them use the shelter's phone before they left.

fugitive arrest warrants in the D.C. area. *See United States v. Sheard,* 473 F.2d 139, 147 (D.C.1972) ("We frown upon police tactics which can at best be described as 'sneaky'—those actions where misrepresentation is used to gain entry, then extensive searches are undertaken supposedly with the dweller's consent."). Thus, the residents were never truthfully informed as to either the nature of the intrusion to which they were consenting or that they had the right to refuse to identify themselves and still leave the shelter. *Schneckloth v. Bustomonte,* 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973) ("subject's *knowledge of the right to refuse is a factor to be taken into account*"). Indeed the Marshals told them just the opposite.

Finally, it bears reminding that these homeless citizens are among the most vulnerable in our nation. *See United States v. Caballero,* 936 F.2d 1292, 1296 (D.C.Cir. 1991) (listing factors to consider); *LaDuke v. Nelson,* 762 F.2d 1318, 1329 (9th Cir. 1985) (migrant farm workers of Mexican heritage with little schooling did not voluntarily consent to searches). Perhaps more than any other group in our society, these people are deprived of even the most basic rights and dignities owing to citizens of our country. As the *testimony* demonstrated, many homeless people are resigned to "the fact that they [have] to be abused just because they are homeless." Tr. Vol. II at 88. Many have had little schooling, are poor, and have medical problems which are exacerbated by their inability to receive health care. To expect this group of citizens to assert their fourth amendment rights in the face of the orders of ten uniformed United States Marshals who arouse them at 5:30 a.m. would be to ignore the realities of homelessness. To label as 'consent' their failure to risk immediate arrest by refusing to produce identification under these circumstances would be to stretch the concept of consent so as to engulf the entire fourth amendment. The fourth amendment is not so fragile as to permit that result. Thus, viewing the totality of the circumstances, the actions taken by the Marshals at the CCNV shelter were non-consensual.

## III. Remedy

Having found that the Plaintiffs' fourth amendment rights were violated by the Marshals on January 9, 1992, this Court must determine what relief is appropriate. Although this Court has heard a great deal of testimony regarding the relationship between homeless people and law enforcement, this Court is neither able nor willing to attempt to address such broad problems in the context of this lawsuit. Rather, any relief which this Court orders must focus only on the CCNV homeless shelter at 425 Second Street, N.W., Washington, D.C. Plaintiffs seek an injunction preventing the Marshals from conducting raids similar to the January 9, 1992 operation at that address in the future.

■ Continued deprivation of the Plaintiffs' fourth amendment rights is the type of irreparable injury necessary to justify injunctive relief. *See Waters v. Barry,* 711 F.Supp. 1121, 1123 (D.D.C.1989) (enjoining enforcement of curfew law); *see also Conner v. City of Santa Ana,* 897 F.2d 1487 (9th Cir.1990); *Community for Creative Non–Violence v. Turner,* 714 F.Supp. 29, 34 (D.D.C.1989) *aff'd in relevant part,* 893 F.2d 1387 (D.C.Cir.1990). Thus, the issue this Court must address is whether it is likely that the Defendants will continue to violate the Plaintiffs' constitutional rights in the future. Substantial portions of the evidence at trial were addressed to this issue, including the direct testimony of Carol Fennelly, a CCNV Director, and Marshal Todd Dillard, the United States Marshal for the Superior Court of the District of Columbia. Both these witnesses, and others, testified as to the conduct, policies, and past practices of the Marshals Service in executing fugitive warrants at the CCNV shelter. In deciding whether there is equity to issue an injunction the Court has taken into consideration: 1) the repeated nature of the Marshals' past conduct; and 2) whether the Marshals Service policy sanctioned the actions at issue in this case and whether they intend to continue those actions.

## A. Past Conduct of the Marshals

Plaintiffs have shown that the Marshals' January 9, 1992 raid was not the first time that this type of operation has occurred at the CCNV shelter. The repetitious nature of the Defendants' conduct is relevant because " 'a federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past.' " *Securities and Exchange Commission v. Savoy Industries, Inc.*, 665 F.2d 1310, 1317–1318 (D.C.Cir.1981), *quoting NLRB v. Express Publishing Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941). Thus, the Court looks to the Defendants' past actions as evidence in predicting Defendants' conduct in the future.

The testimony indicated that there have been at least three previous incidents involving the Marshals and the CCNV shelter before January 9, 1992. On each of the occasions the Marshals, either alone or with officers of the Metropolitan Police Department, conducted similar dragnet identity searches, demanding that innocent third parties produce i.d.'s based on no reasonable belief that the particular people involved were fugitives.[9] After the last incident in 1990, CCNV complained and was assured by the Marshals that such operations would cease. Tr. Vol. II at 84–85.

The Marshals and the CCNV shelter have been unable to agree on a written policy for executing arrest warrants at the shelter. In contrast, the Metropolitan Police Department ("MPD") and the CCNV shelter have developed a mutually acceptable policy for executing arrest warrants at the shelter. That policy has been set down in writing. *See* Def. Exhibit 8. The MPD and the CCNV shelter have developed an acceptable working relationship pursuant to that cooperative effort. Although there were MPD transport vehicles called to the shelter, the MPD officers did not participate in the raid of January 9, 1992. The January 9 raid is one of an ongoing pattern of operations the Marshals have conducted at the shelter.

Before leaving the shelter on January 9, 1992, the Deputy Marshal in charge stated that he felt free to return at anytime—indeed as soon as the next day—and, if necessary, execute another forced entry.[10] Thus, the pattern of past actions by the Marshals gives this Court reason to believe that there is a "real and immediate threat" that their conduct will recur. *See Los Angeles v. Lyons*, 461 U.S. 95, 110, 103 S.Ct. 1660, 1669–70, 75 L.Ed.2d 675 (1983); *LaDuke*, 762 F.2d at 1324.

## B. Sanction of Previous Conduct and Intention to Continue that Conduct

Perhaps the strongest justification for the issuance of an injunction is the fact that, even at trial, the Marshals Service not only maintained that their official policy sanctioned the actions taken in this case but expressed an intention to repeat them. The United States Marshal for the Superior Court of the District of Columbia was not present at the shelter on the morning of January 9, 1992. As the head of the office, however, he testified at trial that no aspect of the operation on that day violated Marshal Service official policy. Tr. Vol. III at 95.[11] In fact, there has not been any indi-

---

**9.** The government argued that this Court may not consider any prior incidents in determining whether equity lies in this case because these incidents involved Marshals from the U.S. District Court, not from the Superior Court. Evidently, some of the raids occurred prior to a reorganization of the United States Marshals Service, creating separate jurisdictions for the Superior and District Court. That position is flawed. The U.S. Marshals cannot shield themselves from liability for their own actions by an internal reorganization of their office or by compartmentalizing the actions of one branch of the Marshals Service.

**10.** The Marshals have agreed not to conduct raids on the shelter pending the outcome of this litigation.

**11.** The Marshals' written policy on the execution of arrest warrants raises on its face grave constitutional concerns. At one point that policy instructs the Marshals that, with an arrest warrant only for one person, they may execute

cation in any proceeding before this Court that the Defendants believe that any aspect of their contact with the shelter was anything but legal and proper.

Even after this Court expressed its opinion as to the applicable law in the case, an opinion in which the government at one point purportedly concurred, the Defendants maintained at trial that they were free to repeat their actions. That position was evidenced by the following exchange between the Court and Marshal Dillard at trial:

The Court: So what you're saying, the Marshals will do that every day in the week then?

Marshal Dillard: No, sir.

The Court: Why is this day different than all other days?

Marshal Dillard: Because we had information that the person for whom we had a fugitive warrant was there at that time.

The Court: So that any time that you have a fugitive warrant that you will do what you did in this case?

Marshal Dillard: Not necessarily, Your Honor.

The Court: But that the law would not prevent you from doing it?

Marshal Dillard: That's correct, sir.

Tr. Vol. III at 96. The Marshals themselves take the position that they were free to repeat their actions in the future. Thus, this Court finds that unless restrained there is a real and immediate threat that the Marshals will repeat their actions at

the CCNV shelter. There are multiple factors which, absent a change in circumstances, support Plaintiffs' argument that jurisdiction lies with this Court to enjoin future dragnet identity checks at the CCNV shelter.

This Court recognizes the need for restraint in the issuance of injunctions which concern the enforcement of criminal laws. *See generally Los Angeles v. Lyons,* 461 U.S. 95, 110, 112, 103 S.Ct. 1660, 1670, 1671, 75 L.Ed.2d 675 (1983).[12] The trial has convinced this Court that both the Marshals and those running the CCNV shelter are good citizens attempting to do difficult jobs. Perhaps the acrimony which so obviously exists between these two groups is due more than anything else to the extraordinary tasks which confront each of them on a daily basis.

It is also clear to this Court that both groups could better accomplish their goals if they put more effort into building a cooperative relationship and less into fighting each other at every turn. The Marshals would be able to execute fugitive arrest warrants more efficiently and less invasively if they were to work out a mutually agreeable procedure with the CCNV shelter along the lines of the CCNV–Metropolitan Police Department agreement. By the same token, CCNV has ample concerns in attempting to provide shelter and services for the homeless without the added burden of defending against charges in the community that it houses fugitives. The shelter's dependence on private funding, its

a forced entry into an innocent third party's home without a search warrant. The Supreme Court has clearly held such conduct to be in violation of the Fourth Amendment in *Steagald v. United States.* 451 U.S. 204, 212–217, 101 S.Ct. 1642, 1647–60, 68 L.Ed.2d 38 (1981). The Marshals' policy, rather than prohibiting such conduct, only notes that evidence seized as a result of such an illegal entry "will be suppressed." Plaintiffs' Exhibit 18 at 7–49—7–50 (citations omitted) (emphasis added); *See also* Tr. Vol. III at 103–105.

**12.** The government argued in its motion to dismiss Plaintiffs' § 1983 claim, and this Court agreed, that the United States Marshals Service for the Superior Court of the District of Columbia is a federal law enforcement organization

operating under color of federal law. *See CCNV,* at 2 n. 1. Thus the considerations of comity and "the judicial concept of 'Our Federalism'" which influenced the Supreme Court in *Lyons, Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), are not present in this case. *See LaDuke v. Nelson,* 762 F.2d 1318, 1324–1325 (1985). Granting an injunction in this case is only a matter of the judicial branch of the federal government taking appropriate steps to ensure that the executive branch of that same government does not continue to violate the constitution. Thus, there is no other forum in which the Plaintiffs might pursue their claims because "[t]his court cannot rely on a state judiciary to correct the unconstitutional practices of federal officials." *LaDuke,* 762 F.2d at 1325.

position as a licensee of the District of Columbia government, and its desire to afford a safe environment for the District's homeless citizens counsel in favor of the shelter establishing a good working relationship with all law enforcement agencies including the Marshals.

Under the circumstances of the Court's Findings of Fact and Conclusions of Law, this Court will enter an order declaring the Marshals' conduct on January 9, 1992 to be in violation of Plaintiffs' constitutionally protected rights. Moreover, because there is a real and immediate threat that the Marshals Service will repeat its constitutionally impermissible conduct, the Court will enjoin the Marshals from conducting warrantless, nonconsensual, dragnet identity searches of the CCNV shelter in the future. Judgment will be entered for the Plaintiffs.